**PRUDENTIAL–MARYLAND JOINT VENTURE COMPANY, Plaintiff,**

v.

**John F. LEHMAN, Jr., et al., Defendants,**

**National Steel & Shipbuilding Company, Intervenor-Defendant.**

Civ. A. No. 83–2756.

United States District Court, District of Columbia.

June 5, 1984.

George M. Coburn, Robert L. Ackerly, Kenneth J. Ingram, Daniel J. Piliero, II, Washington, D.C., for plaintiff.

Judith Bartnoff, Asst. U.S. Atty., Washington, D.C., for defendants.

Michael L. Burack, Washington, D.C., for intervenor-defendant.

## MEMORANDUM OPINION

JUNE L. GREEN, District Judge.

This matter is before the Court on the parties' cross-motions for summary judgment, oppositions thereto, replies to oppositions, oral argument on the motions, the administrative record filed with the Court, and the entire record herein. For the reasons set forth below, the Court finds that the defendants acted properly in the procurement of a hospital ship and accordingly grants defendants' and intervenor-defendant's motion for summary judgment and denies plaintiff's motion for summary judgment.

### Findings of Fact

Plaintiff Prudential-Maryland Joint Venture Company ("Prudential-Maryland"), a disappointed bidder, seeks to have the Court set aside an award of a contract by defendant Navy to intervenor-defendant National Steel & Shipbuilding Company ("NASSCO") and to award the contract to Prudential-Maryland. The specific award at issue is that of a contract for hospital ships (designated "T–AH(X)") for the Navy. The contract provides for the provision of one hospital ship and gives the Navy the option of ordering a second ship. The contract also gives the Navy the option of ordering certain additional "Design Features" on either ship. This option has been exercised by the Navy.

### The Hospital Ships and Their Mission

The primary mission of a hospital ship is to provide as its primary mission, "a mobile, flexible, rapidly responsive afloat medical capability to provide acute medical and surgical care in support of amphibious task forces, Marine Corps, Army, and Air Force elements, forward deployed Navy elements of the fleet and fleet activities and RDF [Rapid Deployment Force] located in areas where hostilities may be imminent." Administrative Record, Tab 17 at 2 ("A.R., Tab"). As a secondary mission, the T–AH(X) is to "provide a full hospital service asset available for use by other government agencies involved in support of disaster relief operations worldwide." *Id.*

### Requests for Proposals

In 1981, the Navy's Military Sealift Command ("MSC") was assigned responsibility for the acquisition of a hospital ship or ships. MSC proposed to acquire the hospital ship by means of competitive negotiation in two phases: (1) development, by contractors, of a contract design (Phase I), and (2) detail design and conversion or construction of the hospital ship (Phase II). A.R., Tab 2 at 1–2.

On September 15, 1981, the contracting officer issued the MSC Request for Proposal ("RFP") N00033–81–R–0079, dated September 2, 1981, for Phase I contracts and announced that the accompanying Circular of Requirements ("COR") (the Navy's minimum technical requirements) for the hospital ships, dated July 31, 1981, was available to interested parties. *Id.*

Subsequent to the issuance of the MSC RFP, the Secretary of the Navy transferred acquisition authority from MSC to the Naval Sea Systems Command ("NAVSEA") of the Department of the Navy. A.R., Tab 4.

NAVSEA issued separate RFPs for Phase I and Phase II. Each phase of the hospital ship acquisition was conducted as a negotiated procurement pursuant to Title 10, United States Code, section 2304(a)(11), and a Determination and Findings ("D & F") was made for each phase of the procurement. A.R., Tab 6; Tab 8; Tab 16; Tab 21.

On November 2, 1981, NAVSEA issued as Amendment 0002 a new Phase I, RFP N00024–82–R–2026(Q), for contract design. A.R., Tab 8. The NAVSEA Phase I RFP for contract design superseded and can-

celled the MSC RFP N00033–81–R–0079 issued by MSC, except that the original COR remained in effect. *Id.* The NAVSEA Phase I contract design RFP specified that only those offerors who were awarded contracts in Phase I would be eligible to compete for the Phase II detail design and conversion (or construction) contract. *Id.* at 3. The NAVSEA Phase I contract design RFP did not govern the Phase II detail design and conversion (or construction) acquisition, and nothing in Section M of the NAVSEA Phase I RFP indicated that the evaluation factors stated therein would be applicable to the Phase II acquisition. *See id.* at 65; A.R., Tab 3.

*Submission of Phase I Proposals*

The Phase I offerors, including Prudential Lines and Apex Marine Corporation, submitted initial proposals for Phase I contract on February 1, 1982. *See* A.R., Tab 8 at 1; Complaint at ¶ 11. The Best and Final proposals for the Phase I contract were submitted on May 14, 1982. *See* Complaint at ¶ 11.

Prudential Lines proposed converting its lighter-aboard-ship ("LASH") vessels into hospital ships. The conversion was to be performed by Maryland Shipbuilding and Drydock Company. Apex Marine Corporation proposed converting its San Clemente class tankers into hospital ships. The conversion was to be performed by NASSCO. *See* Complaint at ¶¶ 11, 12.

*The Award of the Phase I Contracts*

On July 6, 1982, pursuant to the NAVSEA Phase I RFP and COR, contracts were awarded to Prudential Lines, Inc. (teamed with Maryland Shipbuilding Company) and Apex Marine Corporation (teamed with National Steel and Shipbuilding Company) for hospital ship design development, each in the amount of $2 million (later modified to $2.4 million). A.R., Tab 10; Tab 12.

*The NAVSEA Phase II Request for Proposals*

The Navy's minimum hospital ship technical requirements for Phase II were contained in the COR dated October 21, 1982, and were issued to Prudential-Maryland and NASSCO on December 6, 1982. This COR was not subject to other than minor change between the date of issuance and the date of submission of Phase II best and final offers on June 10, 1983. A.R., Tab 17.

The hospital ship detail design and conversion Phase II RFP N00024–83–R–2094(S) was issued by NAVSEA on January 27, 1983, to both Prudential-Maryland and NASSCO and required that initial technical proposals be submitted by offerors by April 6, 1983. A.R., Tab 16 at 1. A $400 million ceiling for the hospital ship program was set forth in Section M of the Phase II RFP. *Id.* at 121. The Phase II RFP provided for the conversion of one hospital ship and contained an option for a conversion of a second hospital ship. *Id.* at 3, 66. It also contained provisions for the Navy to order optional Proposed Design Features to enhance the operational capabilities of the ships. *Id.* at 71c.

Section M of the Phase II RFP set forth the following evaluation factors for determining award of the Phase II contract: Paragraph 1 of Section M of the Phase II RFP stated that the Phase II contract "will be awarded to that responsible offeror whose offer, conforming to the solicitation, will be most advantageous to the Government, price and other factors considered." *Id.* at 121; Paragraph 2 of Section M stated that "[i]t is the intent of the Government that the contract resulting from the solicitation shall not exceed $400,000,000, including options." *Id.;* Paragraph 3 of Section M specified certain minimum requirements that each offeror's proposal must meet and stated that failure to meet any of these requirements would render a proposal "technically unacceptable." *Id.* The specified items included "patient reception and offload requirements (both aircraft and small craft)" set forth in sections 3.2 and 3.3 of the COR [1] and meeting "ABS classifi-

---

1. Section 3.3 of the October 21, 1982 COR required that "[t]he T–AH(X) shall be capable of receiving and discharging non-ambulatory patients from and to boats and landing craft oper-

cation and USCG certification requirements" set forth in section 6.1 of the COR [2] *Id.;* and Paragraph 4 of Section M of the Phase II RFP stated that it was the intent of the Government to award the Phase II contract "to that responsible offeror meeting the minimum requirements of the COR and this RFP who proposes the lowest total price for the basic and option quantities (exclusive of Proposed Design Feature Options) combined." *Id.*

*Prudential-Maryland's Protests of Alleged Changes in Evaluation Factors for the Phase II RFP*

Prudential-Maryland filed a protest of an alleged change in the evaluation scheme contained in the Phase II RFP to Mr. Anthony R. DiTrapani, Director of Shipbuilding, Office of the Assistant Secretary of the Navy (Shipbuilding and Logistics), on March 8, 1983. Complaint at ¶ 19C. Prudential-Maryland complained that, by issuing the Phase II RFP, the Navy changed the evaluation factors for award of the Phase II contract. *See id.* at ¶ 17. Plaintiff claimed that from the inception of this procurement, it was understood that only Phase I evaluation factors would be considered. Those evaluation factors were "technical, cost, schedule and management (in descending order)." *Id.* at ¶ 19b.

Plaintiff's protest was denied by letter from Mr. DiTrapani on March 16, 1983. A.R., Tab 20. The letter explained that the Phase II RFP would be awarded in accordance with the evaluation criteria set forth in Section M of the RFP and that it was appropriate to make price the primary selection factor for Phase II because of the Navy's need to control the cost of the program. *Id.*

Prudential-Maryland never filed a General Accounting Office ("GAO") protest concerning the evaluation criteria or any other aspect of the hospital ship acquisition.

Prudential-Maryland did not file any protest concerning the adequacy of the Phase II RFP's technical specifications.

Prudential-Maryland requested that the Navy extend the time allowed for responding to the RFP due date. The Phase II RFP allowed 10 weeks from the time of its issuance for offerors to submit proposals and Prudential-Maryland was informed that the Navy thought the time provided was adequate. Complaint at ¶ 19a; *see also* A.R., Tab 16 at 112, ¶ 42(E).

The Phase II RFP requested proposals based upon the ships' "earliest projected date of availability" and offerors were to propose delivery dates for the hospital ships in their proposal. Complaint at ¶ 20; A.R., Tab 16 at 7. The Phase II RFP did not provide for evaluation of proposed delivery dates of the hospital ships, *see* A.R., Tab 16 at 121, although both Prudential-Maryland and NASSCO's proposed delivery dates were evaluated in Phase I. Prudential-Maryland did not file a protest challenging the absence of a delivery date in the RFP for Phase II.

The Phase II RFP provided that proposals were to be submitted in base year (September 1982) dollars, and no escalation was to be proposed. *Id.* at 21, 26, 118–19. Escalation was not an evaluation factor for award of the Phase II RFP. *Id.* at 119, 121. Prudential-Maryland did not protest to the Navy that escalation should be proposed or evaluated until after the hospital ship contract was awarded to NASSCO.

Life-cycle costs were not an evaluation factor for award of the Phase II RFP, although they were evaluated in Phase I and were determined to be reasonable for both proposed ship conversions. A.R., Tab 8 at 56–59; Tab 16 at 118, 121; *see also* Cameron Deposition Transcript at 152–53, 174. In Phase I, NASSCO's proposed life-

ating on one side only .... Such operations shall be capable of being carried out both day and night, up to and including Sea State 3." A.R., Tab 17 at § 3.3.

**2.** Section 6.1 of the October 21, 1982 COR required that "[t]he ship or ships shall meet the

requirements of the American Bureau of Shipping, U.S. Coast Guard, Title 46, subchapter H (Passenger Ship) and other regulatory or approval agencies have cognizance over U.S. flag ships." A.R., Tab 17 at § 6.1.

cycle costs were less than Prudential-Maryland's proposed life-cycle costs. Plaintiff did not protest to the Navy that life-cycle costs should be proposed or evaluated for Phase II.

The Phase II RFP did not require the submission or certification of cost or pricing data. On March 15, 1983, the requirement for submission of cost or pricing data as required by DD Form 633 was deleted from the Phase II RFP. *See id.* at 11, 118. Prudential-Maryland did not protest to the Navy that the absence of cost or pricing data or its certification was inappropriate until after the hospital ship contract was awarded to NASSCO.

*The Phase II Source Selection Plan*

In order to provide a rational basis for selecting the proposal which best meets the Navy's requirements for the hospital ships, the Source Selection Authority, on February 8, 1983, approved the Phase II Source Selection Plan ("SSP"). A.R., Tab 19 at 1. This plan was an internal NAVSEA document governing the conduct of the Phase II source selection process. *Id.* The SSP was structured in three tiers: the Technical Evaluation Review Panel, the Source Selection Review Board, and the Source Selection Authority. *Id.* at 2.

The Technical Evaluation Review Panel ("TERP") comprised the first tier of the source selection process. *Id.* The TERP had three constituent technical evaluation teams: the Medical Facility Evaluation Team, the Ship Characteristics Evaluation Team, and the Schedule/Management/Resources Evaluation Team. *See id.* at 2, 36. Each of the three technical evaluation teams was to evaluate each offeror's proposal against the technical and operational requirements established in the RFP and the COR. *Id.* at 15. Section 4.6 of the Phase II SSP set forth evaluation factors to be used by the technical evaluation teams, with detailed questions to guide them, in determining whether a proposal met the requirements of the RFP and the COR. *Id.* at 15–32.

The TERP was to provide guidance and instructions to the technical evaluation teams, review and aggregate the teams' evaluations, prepare a source selection evaluation report, identify items for discussions with offerors, and brief the Source Selection Review Board and the Source Selection Authority concerning the results of the TERP's evaluation. *Id.* at 4, 12–13.

The Source Selection Review Board ("SSRB") comprised the second tier of the source selection process. The SSRB was to supervise and provide guidance to the TERP, review and consider the source selection evaluation report prepared by the TERP, make a source selection recommendation to the Source Selection Authority, and document the justification for the source selection decision. *Id.* at 4.

The Source Selection Authority ("SSA") comprised the third tier of the source selection process. The SSA was to ensure that the entire source selection process was properly and efficiently conducted and to make the final source selection decision. *Id.* at 3.

The Phase II SSP provided that the Phase II contract for the acquisition of the hospital ships would be awarded to the responsible offeror whose proposal meets the minimum requirements of the RFP and the COR and provides the lower price. *Id.* at 11.

*Submission and Discussion of Initial Technical Proposals for Phase II by Prudential-Maryland and NASSCO*

On April 6, 1983, Prudential-Maryland and NASSCO timely submitted their initial technical proposals for the Phase II contract. Complaint at ¶ 21.

On April 14, 1983, NAVSEA sent to Prudential-Maryland and to NASSCO identical transmittal letters stating that a preliminary review of the initial Phase II technical proposals had occurred and that, based on the review, certain clarifications of the initial proposals should be provided to NAVSEA by April 20, 1983. A.R., Tab 22. The particular items to be clarified by each offeror were specified in a separate enclosure to that offeror's transmittal letter. *Id.*

On April 29, 1983, NAVSEA sent to Prudential-Maryland and NASSCO identical transmittal letters stating that, although evaluation of the initial Phase II technical proposals was not yet complete, NAVSEA had already identified certain ambiguities, discrepancies, and deficiencies in the proposals. A.R., Tab 23. The transmittal letter to each offeror had two enclosures, one addressing the areas of that offeror's proposal which NAVSEA was requesting clarification ("clarification questions") and the other addressing the areas of that offeror's proposal that NAVSEA found did not meet the minimum requirements established in the COR or the RFP ("requirement questions"). *Id.* The NAVSEA transmittal letters also stated that additional areas of ambiguity, discrepancy, or deficiency would be identified when NAVSEA finished its evaluation of the proposals. *Id.*

The April 29, 1983 NAVSEA transmittal letters requested each offeror to meet with NAVSEA on May 5, 1983. *Id.* Each of the offerors submitted responses to the April 29, 1983 clarification questions and requirement positions.

On May 18, 1983, the TERP submitted its Preliminary Report to the SSRB. Tab 24, Preliminary TERP Report (May 18, 1983). The report included sets of additional clarification questions and requirement questions directed to the offerors, which were intended as proposed questions to be used by NAVSEA in its negotiations with the offerors. *Id.* The report also included reports from the three technical evaluation teams about each offeror's initial Phase II technical proposal. *Id.*

The TERP Preliminary Report stated that the initial technical proposals of both offerors had significant deficiencies compared to the Navy's requirements. *Id.* at 1. The report recommended that the proposed clarification questions and requirement questions be sent to each offeror and that Best and Final submissions be requested from the offerors in order to allow the offerors to rectify the deficiencies. *Id.*

The SSRB met on May 18 and 19, 1983, to review the TERP Preliminary Report and the proposed negotiation questions. At the meeting, the SSRB reviewed the proposed negotiation questions and decided unanimously to call for the offerors to submit Best and Final technical proposals by June 10, 1983. A.R., Tab 25 at 1–2.

On May 20, 1983, the contracting officer sent to Prudential-Maryland and to NASSCO identical transmittal letters stating that NAVSEA had completed its evaluation of the initial Phase II technical proposals. A.R., Tab 26. The letters transmitted to each offeror a set of negotiation questions containing both requirement questions and clarification questions. *Id.* The requirement questions addressed areas of the offeror's proposal that did not meet the requirements of the COR or the RFP. *Id.* The clarification questions addressed areas that required further clarification. The letters stated that NAVSEA would meet with each offeror on May 26, 1983, to discuss any questions the offeror might have with respect to the enclosed requirement questions and clarification questions. *Id.* It stated that discussions would close on June 3, 1983, and that each offeror must submit its response to questions, price proposal, and Best and Final technical proposal to NAVSEA by June 10, 1983. *Id.* The offerors were free to revise their proposals in light of the discussions and to incorporate any revision in their Best and Final technical proposal.

On May 26, 1983, NAVSEA met with each offeror to discuss questions the offeror might have with respect to the requirement questions and clarification questions addressed to that offeror. Complaint at ¶ 30c. Between May 27 and June 3, 1983, Prudential-Maryland had daily telephone conversations with NAVSEA concerning the requirement questions and clarification questions addressed to Prudential-Maryland. Complaint at ¶ 30d.

On June 3, 1983, NAVSEA sent to Prudential-Maryland and to NASSCO letters reaffirming that discussions closed on June 3, 1983, and that price proposals and Best and Final technical proposals would be due on June 10, 1983. A.R., Tab 27. The June

3, 1983 letters to NASSCO and Prudential-Maryland were identical except that the letter sent to Prudential-Maryland included an additional sentence expressing NAVSEA's concurrence in a June 2, 1983 letter from Prudential-Maryland regarding its request for progress payments. *Id.*

*Submission and Evaluation of Best and Final Proposals*

On June 10, 1983, Prudential-Maryland and NASSCO submitted their Best and Final technical proposals and price proposals to NAVSEA. Complaint at ¶ 21.

On June 24, 1983, the TERP submitted to the SSRB its draft of the Final TERP Report concerning the evaluation of the Best and Final technical proposals. A.R., Tab 28. The draft report stated that the final report would be substantially identical to the draft report, except that the final report would include an Executive Summary. *Id.*

The TERP found that the Prudential-Maryland proposal did not meet the minimum requirements of the COR because Prudential-Maryland's proposal contained "several significant areas of non-compliance as well as some minor areas of non-compliance ...." *Id.* The TERP found that the NASSCO proposal was "substantially in compliance" with the COR, although the NASSCO proposal was found to contain some areas of noncompliance that were considered minor in nature. *Id.* For the reasons cited in the enclosures to its report, the TERP recommended that the Prudential-Maryland proposal be considered "not technically acceptable" and that the NASSCO proposal be considered "technically acceptable." *Id.*

The enclosures to the TERP report included (1) evaluations of each offeror's responses to the requirement questions and clarification questions and (2) the final reports prepared by the three technical evaluation teams regarding each offeror's Best and Final technical proposal. *Id.*

Enclosure 11 to the TERP report listed the areas in which the TERP found the Prudential-Maryland Best and Final technical proposal to be in noncompliance with the requirements of the COR. *Id.* at Enclosure 11. The TERP found the Prudential-Maryland proposal to contain "significant deficiencies"[3] in the following six areas:

(1) Ward Noise/Vibration (excessive noise and vibration in four intermediate care and two light care wards located directly below the helicopter landing and take-off deck), *see, id.* at TERP Report for Prudential-Maryland, Question 4(R);

(2) Ward General Storage (insufficient general storage area for each intermediate care ward), *see id.* at Question 6(R);

(3) Medical Facility Gross Square Footage (insufficient area for intermediate/light care wards, laboratory, central sterile receiving, lens laboratory, medical repair, dental service, sick call clinic, and laundry), *see id.* at Questions 7(R), 9(R), 10(R), 65(R), 72(R), 73(R);

(4) Elevators (too small to meet requirements for use with two standard gurneys and attendant staff), *see id.* at Question 12(R);

(5) Patient Reception by Boat (inadequate arrangements for receiving patients from small boats), *see id.* at Question 43(R); and

(6) Laundry (insufficient laundry capacity), *see id.* at Question 84(R).

In addition to these six significant deficiencies, the TERP found that the Prudential-Maryland proposal contained fifteen "minor deficiencies"[4] and eight "areas

---

**3.** As used by the TERP, a "significant deficiency" is an item of noncompliance that is "considered to require a substantial investment of time and money to correct. Correction of these deficiencies would require considerable redesign effort or create a domino effect, requiring other areas to undergo a major redesign." A.R., Tab 31 at 1.

**4.** As used by the TERP, "minor deficiencies are those where the offeror's proposal does not meet the minimum requirements of the COR but where correction can be made without a major redesign effort." A.R., Tab 31 at 1.

where compliance with the COR could not be validated."[5] *Id.* at Enclosure 11.

Enclosure 12 to the TERP report listed the areas in which the TERP found the NASSCO Best and Final technical proposal to be in noncompliance with the requirements of the COR. *Id.* at Enclosure 12. The TERP found that the NASSCO proposal contained no significant deficiencies, three minor deficiencies, and five areas where compliance with the COR could not be validated. *Id.* The areas where compliance could not be validated included NASSCO's superstructure strength calculations and the emergency electrical (generator and switchboard) arrangements. *Id.* The TERP report indicated that its concerns in these areas could not be fully satisfied by NASSCO's responses, but that it would rely on the American Board of Shipping ("ABS") and the United States Coast Guard's approval as to the question of compliance. *Id.* at Enclosures 1–5.

On June 24, 1983, the SSRB met to consider the hospital ship source selection. A.R., Tab 30.

After reviewing the reports from the TERP, the SSRB determined that Prudential-Maryland's proposal did not meet the minimum requirements of the COR. *Id.* The SSRB found that the Prudential-Maryland proposal contained five significant deficiencies in the following five areas: (1) Ward General Storage; (2) Medical Facility Gross Square Footage; (3) Elevators; (4) Patient Reception by Boat; and (5) Laundry. *Id.;* A.R., Tab 29. In addition, the SSRB found that the Prudential-Maryland proposal contained sixteen minor deficiencies and seven areas where compliance with the COR could not be validated. A.R., Tab 29. The SSRB determined that requesting another round of Best and Final technical proposals would not be likely to result in a Prudential-Maryland proposal's meeting the minimum requirements. A.R., Tab 30. The SSRB also determined that the NASSCO proposal met the minimum

requirements of the COR and recommended to the SSA that the contracting officer be authorized to open the NASSCO price proposal envelopes. *Id.*

The TERP prepared an Executive Summary on June 25, 1983, to highlight the deficiencies identified in each offeror's technical proposal. A.R., Tab 31. The TERP Executive Summary stated that the NASSCO Best and Final technical proposal contained no significant deficiencies and three minor deficiencies. *Id.* at 1. The executive summary also listed three areas in NASSCO's proposal where compliance with the COR and RFP could not be validated. They included superstructure strength calculations which appeared to be below that required by the ABS and the emergency electrical (generator and switchboard) arrangements which also might not comply with U.S. Coast Guard requirements. *Id.* at 1–2. As to the Prudential-Maryland Best and Final technical proposal, the TERP Executive Summary stated that its proposal contained six significant deficiencies and fifteen minor deficiencies. *Id.* at 2–5. The six major deficiencies involved excessive noise and vibration in the wards, inadequate general storage for the wards, insufficient gross square footage for various medical areas, insufficient elevator size, inadequate means for receiving patients from small boats, and insufficient laundry facilities. The Executive Summary also stated that the work schedule proposed by Prudential-Maryland was "unrealistic," because it did not contain allowance for correction of emerging problem areas. *Id.* at 2. The Executive Summary set forth the TERP's rationale for its determination regarding each deficiency in each offeror's proposal.

A briefing paper regarding Prudential-Maryland's proposal was prepared for the SSA on June 25, 1983. A.R., Tab 32. The briefing paper listed the deficiencies found in Prudential-Maryland's proposal and set

---

**5.** As used by the TERP "[a]reas where compliance with the COR cannot be validated are those items for which a determination cannot be made. These areas arise because of confusion generated by the proposal, or because the data supplied is contradictory. In other cases the absence of data prevents a determination from being made." A.R., Tab 31 at 1.

forth the procurement history of each deficiency. *Id.*

On June 27, 1983, the SSA informed the contracting officer by memorandum that, after reviewing the TERP and SSRB reports, the SSA concurred with their findings. A.R., Tab 33. The SSA's memorandum stated that NASSCO's Best and Final technical proposal met the minimum requirements of the COR and that Prudential-Maryland's Best and Final technical proposal did not meet the minimum requirements of the COR. *Id.* The SSA's memorandum also stated, however, that in order to ensure that the SSA considered all available information concerning any possible need to conduct further discussions with the offerors, the SSA authorized the contracting officer to open the price proposals of both offerors, after which the SSA would determine whether further discussions would be reasonably likely to make the currently unacceptable Prudential-Maryland proposal acceptable at a lower overall price to the Government. *Id.*

Both Prudential-Maryland's and NASSCO's price proposals were opened on June 27, 1983. Prudential-Maryland's price was $357 million. NASSCO's price was $344,-797,816. A.R., Tab 34. On this basis, the SSA determined that there was no reason for further discussions or another round of Best and Final proposals and declared "NASSCO the winner of this competition." A.R., Tab 35.

*The Award of the Phase II Contract*

On June 27, 1983, the Acting Commander of NAVSEA sent a memorandum to the Assistant Secretary of the Navy for Shipbuilding and Logistics ("the Assistant Secretary") requesting final approval to proceed with the award of the Phase II contract to NASSCO. A.R., Tab 37. Also on June 27, NAVSEA prepared a Business Clearance Memorandum specifying NASSCO as the contractor. A.R., Tab 38.

The Chief of Naval Material sent a memorandum to the Assistant Secretary endorsing NAVSEA's request for approval to proceed with the award of the Phase II contract, and on June 29, 1983, the Principal Deputy, Assistant Secretary of the Navy approved the award of the Phase II contract to NASSCO. A.R., Tab 37.

NASSCO and the Navy signed the Phase II contract on June 29, 1983. A.R., Tab 39.

On June 28, 1983, the Navy and NASSCO entered into communications concerning the purchase price NASSCO had planned to pay Apex for the tankers that were to be converted into hospital ships. As a result of those communications, the Navy and NASSCO entered into Modification P00001, effective June 29, 1983, the same day the contract was awarded to NASSCO. *Id.* at Modification P00001. Under Modification P00001, NASSCO was obligated to exert its "best efforts to acquire the vessels from Apex for an acquisition cost of less than $30 million per vessel." *Id.* NASSCO further agreed that if the vessels were acquired for a cost of less than $30 million, the contract price would be reduced accordingly. *Id.* No actual reduction in the cost of the Apex vessels, however, was required. *See id.*

The communications regarding Modification P00001 and the execution of Modification P00001 occurred after evaluation of the proposals and the selection of NASSCO for award by the SSA and the signing of the Business Clearance Memorandum by officials of Navy Materials ("NAVMAT"). *See, e.g.,* Defendants' Motion for Summary Judgment, Kevin J. O'Neill Affidavit at ¶ 8 ("O'Neill Affidavit").

Modification P00001 does not provide for substitution of vessels by NASSCO. A.R., Tab 39, at Modification P00001; O'Neill Affidavit at ¶ 11. Further, agreement to the terms of Modification of P00001 by NASSCO was not a condition for award of the contract. O'Neill Affidavit at ¶¶ 13, 14, 15.

The contracting officer, as stated in the Business Clearance Memorandum, determined certified cost and pricing data were not required because adequate price competition existed and the NASSCO price was fair and reasonable. A.R., Tab 38 at 8.

Even though the acquisition cost of the hospital ship was such that the Secretary of Defense could have designated the hospital ship acquisition a "major system" acquisition, he designated the hospital ship acquisition as Acquisition Category II ("ACAT II") as defined in OPNAV Instruction 500042A and, therefore, was not designated as a "major system." Defendants' Motion for Summary Judgment, Exhibit 1, Acquisition Plan 302–82 at ¶ 12 (March 1983).

### Conclusions of Law

This matter comes to the Court on the parties' cross-motions for summary judgment. Under Rule 56(c) of the Federal Rules of Civil Procedure a court may grant summary judgment

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). In the present case, the Navy has filed an extensive administrative record which details its needs and the selection process for the T–AH(X) hospital ship acquisition. The administrative record was further supplemented by deposition testimony and discovery documents.

 The standard of review in a disappointed-bidder case is quite limited. In order to prevail in this form of action, a losing bidder must demonstrate that agency's decision "on matters committed primarily to [its] own discretion had no rational basis or [that] the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations." *Kentron Hawaii, Ltd. v. Warner,* 480 F.2d 1166, 1169 (D.C.Cir.1973) (footnotes omitted). So long as there is a reasonable basis for an agency's action in matters involving procurement, "the court should stay its hand even though it might, as an original

proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir.1971). As stated in *Seamans,* in reviewing challenges to Government procurement, a court must

> fully take into account the discretion that is typically accorded officials in the procurement agencies by statutes and regulations. *Such discretion extends not only to the evaluation of bids submitted in response to a solicitation but also to determination by the agency with respect to the application of technical, and often esoteric, regulations to the complicated circumstances of individual procurements.*

*Id.* (emphasis added); *see also Sun Ship, Inc. v. Hidalgo,* 484 F.Supp. 1356, 1358 (D.D.C.1980). Therefore, the Navy's determination of needs and judgment on technical matters is entitled to great deference by this Court.

The Court concludes that there is no genuine issue as to any material fact. The Navy's reasons for its determinations and decisions are fully set forth in the record, without dispute, and there is no need for a trial to determine whether those reasons have a rational basis.

For the reasons set forth below, the Court concludes that the Navy and NASSCO are entitled to judgment in their favor and that Prudential-Maryland is not entitled to the relief it has requested.

### A. The Phase II Evaluation Factors Were Proper Evaluation Criteria for the Hospital Ship's Procurement

The competition for a T–AH(X) hospital ship was conducted in two phases: Phase I for contract design and Phase II for detail design and conversion.[6] A separate RFP was issued by NAVSEA for each phase of the project. Each RFP contained its own evaluation factors. The Phase II evaluation factors, as set forth in Section M of

---

6. The original RFP issued by MSC addressed both Phase I and Phase II but this RFP was cancelled and superseded by the NAVSEA Phase

I RFP, which, expressly by its terms, was limited to Phase I of the procurement process. *See* A.R., Tab 2, Tab 8.

the Phase II RFP, remained the same from January 27, 1983, when the Phase II RFP was issued, through the end of the Phase II procurement. The RFP provided that award of the Phase II contract was to be made to that "responsible offeror meeting the minimum requirements of the COR and this RFP who proposes the lowest total price for the basic and option quantities ... combined." A.R., Tab 16 at 121. It was on that basis that the Phase II proposals were evaluated and upon which NASSCO was awarded the Phase II contract.

The evaluation factors for Phase II were made known to the offerors simultaneously in the Phase II RFP. Prudential-Maryland and NASSCO were both treated fairly and equally by the Navy.

 Although the Navy did not change the evaluation factors during Phase II, it would have been perfectly proper for the Navy to have made such a change during the competition. It is plain that the Government has the right to determine its procurement needs. *General Exhibits, Inc.*, B–188916, August 9, 1977, 77–2 CPD ¶ 101 at 6; 53 Comp.Gen. 270 (1973). If those needs change during the course of a procurement, the Government may modify the solicitation requirements by written amendment to the solicitation. *E.g., Systems Group Associates, Inc.*, B–198889, May 6, 1981, 81–1 CPD ¶ 349 at 3. So long as the amendment is furnished to all offerors involved in the acquisition when the change is made, it is proper. Defense Acquisition Regulation ("DAR") 3–805.4, 3–505; *Union Carbide Corp.*, B–184495, February 26, 1976, 76–1 CPD ¶ 134. Even if the Navy had treated both phases of the hospital ship acquisition as a single procurement, which Prudential-Maryland argues the Navy should have done, it would not have been improper for the Navy to change the requirements or the evaluation factors during the competition, so long as it provided proper notice of the change to all interested parties.

In challenging the Navy's choice of the Phase II evaluation criteria, as set forth in the Phase II RFP, Prudential-Maryland argues that the Phase II evaluation criteria were improper in three respects. First, Prudential-Maryland asserts that the Navy was required to evaluate life-cycle costs in the Phase II price evaluation. Second, Prudential-Maryland claims that the Navy was required to do a comparative technical analysis, rather than using a meeting-the-minimum-requirements approach, in the Phase II technical evaluation. Third, Prudential-Maryland argues that in this procurement the Navy was "equitably estopped" from using evaluation criteria in Phase II which differed from those used in Phase I.

1. Evaluation of Life-Cycle Costs

Prudential-Maryland's first line of argument is that the Navy's award to NASSCO should be overturned because the Navy did not evaluate life-cycle costs in Phase II. Plaintiff contends that the Navy was required to evaluate such costs in Phase II by DAR 1–335, OMB Circular No. A–109, Department of Defense ("DOD") Directives 4105.62 and 5000.1, Secretary of the Navy ("SECNAV") Instruction 5000.-1A, NAVMAT Instruction 4200.49.

 The Court observes first that this hospital ship procurement was not designated as a "major system" acquisition by the Secretary of Defense, so the cited regulation and directives *do not apply* (or apply only to the extent the documents say they apply to nonmajor programs) to this hospital ship procurement.

In examining DAR 1–335, the only provision in the Defense Department's acquisition regulations, which specifically addresses life-cycle costs, the regulation merely indicates that "such costs *be considered* in development and acquisition decisions in order that proper consideration can be given to those systems or equipments that will result in the lowest life-cycle cost to the Government." DAR 1–335 (emphasis added). The regulation does not state that life-cycle costs must be a specific evaluation factor in the procurement process. *See Big Bud Tractors, Inc.*, B–209858, February 4, 1983, 83–1 CPD ¶ 127 at 4 ("we do

not read [DAR 1–335] as requiring that life-cycle costs be an evaluation factor for each award").

■ In addressing the directives, instructions, and circulars mentioned above, it is important to note that none of these provisions has the force and effect of law. *Chrysler Corp. v. Brown*, 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979); *see also Moore Service, Inc.*, B–24704.2, June 4, 1982, 82–1 CPD ¶ 532 at 7; *United States District Court for the District of Columbia*, B–194088, April 26, 1979, 79–1 CPD ¶ 301. The Court also notes that these directives provide only internal guidance for agencies conducting procurements and do not provide a basis for upsetting a contract award. For example, OMB Circular A–109 expressly states: "This Circular provides administrative direction to heads of agencies and does not establish and shall not be construed to create any substantive or procedural basis for any person to challenge any agency action or inaction on the basis that such action was not in accordance with this Circular." OMB Circular A–109 at ¶ 3. The other directives are all similarly designed and promulgated to provide purely internal directives for defense agencies when conducting a procurement.

In addition, it is plain to the Court that OMB Circular A–109, DOD Directives 4105.62 and 5000.1, SECNAV Instruction 5000.1A, and NAVMAT Instruction 4200.49 do not provide a basis for upsetting the contract award. Nothing in any of the provisions of these directives *required* the Navy, in its Phase II evaluation factors, to evaluate the life-cycle costs in the source selection or to weigh any particular factors when making its procurement decisions. The directives grant broad discretion to the procuring agencies to tailor the details of particular procurements as they best see fit, within the generally prescribed multi-tiered structure of the source selection process. They emphasize the importance of agency discretion in "tailor[ing] an acquisition strategy to accommodate the unique aspects of a particular program ...." DOD Directive 5000.1 ¶ E.9; *see also* OMB

Cir. A–109, ¶ 7.f. In particular, SECNAV Instruction 5000.1A states:

> The inherent flexibility of ... [DOD Directive 5000.1 and 5000.2], as well as the broad policies upon which they are based, provides maximum latitude for development of sound, but not necessarily identical, acquisition strategies for the various types of acquisitions in the Department of the Navy (DON).

SECNAV Instruction 5000.1A at ¶ 4. The very language upon which Prudential-Maryland relies to demonstrate that the Navy was bound by regulations which directed that life cycle costs had to be evaluated, states that the SSA should "[e]nsure that cost (development, production, and support) is *appropriately* considered as an integral element of proposal evaluation ...." NAVMAT Instruction 4200.49 at Enclosure (2), DOD Directive 4105.62 (emphasis added). This language makes clear that the SSA has the flexibility to use its best judgment in determining the "appropriate" manner of considering costs. The language of the directives does not require that the Navy treat costs in any particular way, let alone mandate that life-cycle costs be evaluated in this particular procurement.

■ By examining the undisputed testimony of the Navy deponents, it is plain that costs *were* treated "appropriately," *see* O'Neill Deposition Transcript at 116–17; Rear Admiral George W. Davis, Jr. Deposition Transcript at 47 ("Davis Deposition Transcript"), and that it would have been inappropriate to take life-cycle costs into account in evaluating the prices the offerors submitted in Phase II. Anthony R. DiTrapani Deposition Transcript at 41, 59–60 ("DiTrapani Deposition Transcript"); Everett Pyatt Deposition Transcript at 272–74 ("Pyatt Deposition Transcript"). The Navy had already considered life-cycle costs as part of the cost evaluation during Phase I. O'Neill Deposition Transcript at 24; John Charles Cameron Deposition Transcript at 150–53 ("Cameron Deposition Transcript"); Edmund Craig Mortimer Deposition Transcript at 80 ("Mortimer

Deposition Transcript"). The Navy determined that it was unnecessary to evaluate life-cycle costs again in Phase II, because the projected life-cycle costs of the two offerors would be essentially the same in Phase II as they had been in Phase I, Mortimer Deposition Transcript at 84, 221; the Navy had already determined in Phase I that the projected life-cycle costs of both NASSCO and Prudential-Maryland were acceptable;[7] and the Navy wanted in Phase II to emphasize savings in purchase price because of the budgetary constraints that had been placed on the hospital ship program. Mortimer Deposition Transcript at 62; *see also id.* at 54, 62; A.R., Tab 16 at 121. For these reasons, the Navy determined that the Phase II award should be based on the lowest proposed contract price for the two ships, and it therefore did not undertake another life-cycle cost evaluation.

 The Navy's determination that the Phase II award should be based on the lowest proposed contract price was well within the broad discretion that procuring agencies have in selecting evaluation criteria for individual procurements. *See, e.g., Galler Associates, Inc.*, B–210204, May 16, 1983, 83–1 CPD ¶ 515 at 3 ("A contracting agency has broad discretion to establish an evaluation plan that is best suited to its needs."); *AAA Engineering and Drafting, Inc.*, B–204664, April 27, 1982, 82–1 CPD ¶ 387 at 5 ("It is well settled that a determination of an agency's minimum needs and the selection and weights of evaluation criteria to be used to measure how well offerors will meet those needs are within the broad discretion entrusted to agency procurement officials"), *citing Augmentation Inc.*, B–186614, September 10, 1976, 76–2 CPD ¶ 235; *SETAC, Inc.*, B–209485, July 25, 1983, 83–2 CPD ¶ 121 at 10 ("Selection officials ... have broad discretion in determining the manner and extent to which they will make use of technical or cost evaluation results...."); *Jonathan Corp.*, B–199407.2, September 23, 1982, 82–2 CPD

¶ 260 at 2 ("Procuring agencies are relatively free to determine the manner in which proposals will be evaluated so long as the method selected provides a rational basis....").

 This discretion extends to a procuring agency's decision, in the "exercise of [its] informed judgment," not to evaluate life-cycle costs. *Big Bud Tractors, Inc.*, B–209858, February 4, 1983, 83–1 CPD ¶ 127 at 4, 1 F.C.P.D. ¶ 88 (March 22, 1983). The Comptroller General has thus upheld awards against protest complaining that the procuring agency failed to evaluate life-cycle costs; indeed, if life-cycle costing is to be applied, the RFP must so notify all offerors. *Eastman Kodak Co.*, B–194584, August 9, 1979, 79–2 CPD ¶ 105 at 8. Where, as in Phase II of this procurement, "there is simply no relevant RFP language which can reasonably be construed to call for the evaluation of life-cycle costing," a protest that the Government improperly failed to consider life-cycle costs in evaluating proposed prices must fail. *Wild Heerbrugg Instruments, Inc.*, B–210092, September 2, 1983, 83–2 CPD ¶ 295 at 3.

### 2. Failure To Do Comparative Technical Analysis

Prudential-Maryland also argues that the Navy's technical evaluation for the Phase II RFP evaluation criteria should not have been on the "minimum requirements" approach and the lowest offered price. Plaintiff contends that the Navy was required to use a "technical superiority" approach, that is, to do a numerical scoring of the various technical aspects of each proposed vessel, giving extra points for areas where the vessel exceeds the minimum requirements. Prudential-Maryland's argument rests on the same documents as its life-cycle-cost argument, that of NAVMAT Instruction 4200.49, DOD Directive 4105.62 and the Phase II Source Selection Plan. As outlined above, claimed violations of these purely internal agency documents provide

---

**7.** In looking at the Phase I cost evaluation, it was NASSCO who prevailed over Prudential-

Maryland by a margin of 63.40 points. *See* Deposition Exhibit 14.

no basis for granting relief to a disappointed bidder. *See supra* at 31.

█ In addition, just as there was no violation of these directives with respect to the Phase II price evaluation criterion, so too was there no violation with respect to the Phase II technical evaluation criterion. The language upon which Prudential-Maryland relies requires only that the SSA consider technical objectives "appropriately" in the proposal evaluation. This language does not mandate any particular approach to the technical evaluation process but confers broad discretion on agency procurement officials to take the approach that, in their judgment, will best suit the agency's needs. The relevant case law emphasizes the broad discretion that procuring agencies have in selecting evaluation criteria, *see supra* at 35, specifically in the technical evaluation criteria. *GTE Automatic Electric, Inc.*, B–209393, September 19, 1983, 83–2 CPD ¶ 340 at 5–6 (where Air Force does not consider the new or used character of equipment to be an effective evaluation factor, Air Force is not required to compare used equipment with new equipment during evaluation); *AAA Engineering and Drafting, Inc.*, B–204664, April 27, 1982, 82–1 CPD ¶ 387 at 9 (where the RFP does not mandate or preclude any particular method of evaluation, GAO "will not question the reasonableness of" the methods used); *Joseph Legat Architects*, B–187160, December 13, 1977, 77–2 CPD ¶ 458 at 11 (" 'selection of evaluation criteria and their relative weights ... is primarily for the determination of the agency' "), *quoting Houston Films, Inc., (Reconsideration)*, B–184402, June 16, 1976, 76–1 CPD ¶ 380 at 2.

While it is true that the Navy could not properly arrive at a decision to use a minimum-requirements approach in an arbitrary, capricious or unreasoned manner, the record is devoid of any suggestion that the Navy did that here. The Navy procurement personnel considered the Phase II evaluation approach in light of all the relevant factors, including what they had learned in the Phase I competition and the budgetary constraints that had been imposed on the hospital ship program. *See* Mortimer Deposition Transcript at 62; DiTrapani Deposition Transcript at 38–39. Their decision to adopt the approach they did represented their informed judgment as to how best to proceed under the circumstances and was entirely lawful and proper.

### 3. Equitable Estoppel

█ Prudential-Maryland's third argument, that the Navy was equitably estopped from using criteria in Phase II which differed from those used in Phase I because some Navy personnel had indicated that they thought that the criteria would be the same, is without merit. While a party may be estopped from assuming inconsistent positions to the detriment of another party, the Navy never assumed inconsistent positions here. Until the Phase II evaluation factors were adopted and issued, the Navy procurement personnel did not know that evaluation factors would in fact apply in Phase II. O'Neill Deposition Transcript at 53–54; Cameron Deposition Transcript at 110. As they testified, the factors set out in the Phase I RFP might or might not apply in Phase II, depending upon what the Phase II RFP said. Davis Deposition Transcript at 27–28; Cameron Deposition Transcript at 122–24. This is not an "inconsistency"; it is simply a reflection of the fact that the Navy contracting personnel did not know in advance what evaluation factors would govern Phase II.

### B. The Navy's Price Evaluation Was Proper

Prudential-Maryland challenges the Navy's conclusion that NASSCO was the lower-priced offeror. *If* both offerors had submitted technically acceptable proposals, the Navy would have been required by the Phase II RFP to award the contract to the offeror "who propose[d] the lowest total price for" the two ships.

It is undisputed that the NASSCO proposal contained the lower price. Prudential-Maryland contends, however, that the

Navy should have adjusted those prices for certain escalation costs that might arise during the construction period and that, if incurred, would be compensable under the "Compensation Adjustments" clause of the contract.

■ The Court finds that this argument is without merit. Cost escalation evaluation was not included in the Phase II RFP as an evaluation factor, and so it would have been inappropriate for the Navy in its evaluation of best proposals to consider escalation costs. *See California Microwave, Inc.*, B–202317, June 17, 1981, 81–1 CPD ¶ 505 at 4 (because there was "nothing in the RFP which called for application of the price adjustment index," the Government was not required to apply escalation to the proposed option prices).

■ It is well established that procuring agencies have broad discretion to determine the criteria to be used in evaluating proposals and making contract decisions. *E.g., Galler Associates, Inc.*, B–210204, May 16, 1983, 83–1 CPD ¶ 515; *Augmentation, Inc.*, B–186614, September 10, 1976, 76–2 CPD ¶ 235. In this procurement the Navy could have elected to evaluate escalation cost, but it determined that it would be inappropriate to do so.

The Navy made the decision because of the speculative nature of including escalation costs in the price evaluation. The projection of future escalation costs over a multi-year period is highly speculative and subject to "gaming" by offerors, it therefore does not provide a reliable basis for evaluating shipbuilding price proposals. DiTrapani Deposition Transcript at 60–61; Cameron Deposition Transcript at 175; Davis Deposition Transcript at 41, 66, 81; O'Neill Deposition Transcript at 109–10, 174–75; Pyatt Deposition Transcript at 259–60. The Navy's general practice has been not to include escalation costs in evaluating price proposals submitted in fixed-price-type shipbuilding procurements. DiTrapani Deposition Transcript at 61, 65; Cameron Deposition Transcript at 176; Davis Deposition Transcript at 38, 41, 66–67; O'Neill Deposition Transcript at 174–75.

The Comptroller General also has recognized that possible price increases due to escalation are of a "speculative nature" and thus may be excluded from consideration in comparing two offerors' proposed prices. *Bristol Electronics, Inc.*, B–193591, June 7, 1979, 79–1 CPD ¶ 403 at 4. The DAR provisions cited by plaintiff, including DAR 1–305.2(a), 3–801.1, 3–807.7, and 3–404.3, do not indicate that escalation costs be evaluated in a negotiated acquisition. The Court accordingly finds that the Navy did not abuse its discretion when it decided not to evaluate escalation costs.

C. The Navy Had a Rational Basis for Determining that Prudential-Maryland's Proposal Failed to Meet the Minimum Technical Requirements

■ A procuring agency has broad discretion in evaluating proposals, and this discretion should be "fully take[n] into account" in deciding challenges to technical evaluations. *M. Steinthal & Co. v. Seamans*, 455 F.2d at 1301. A procuring agency's technical judgments on such matters should be given great deference and may not be overturned unless they are without *any* rational basis. *Id.; Kentron Hawaii, Ltd. v. Warner*, 480 F.2d at 1169. The Navy had a rational basis for its decision here.

The bases for the Navy's determination that Prudential-Maryland's proposal was technically unacceptable are set forth in the Final TERP Report, the SSRB Decision, the SSRB Findings and Recommendations, the Executive Summary, the Briefing Paper for the SSA, and the SSA Decision. A.R., Tabs 28–32, Tab 35. Each of the areas of Prudential-Maryland's Best and Final technical proposal that was found to be deficient was noted in the Preliminary TERP Report, A.R., Tab 24, and was the subject of discussion questions issued to Prudential-Maryland. *See* A.R., Tabs 22–26.

■ The Navy found that Prudential-Maryland's Best and Final proposal contained five major deficiencies and numer-

ous minor deficiencies. A review of the record demonstrates that plaintiff has not satisfied its burden, under *M. Steinthal & Co.* or *Kentron Hawaii, Ltd.*, to prove that the Navy's evaluation of the Prudential-Maryland's technical proposal had no rational basis. Although Prudential-Maryland has presented the affidavits of "two disinterested experts" in marine engineering who disagree with the Navy's findings, a protestor's disagreement with technical judgments of an agency does not render those technical judgments invalid or demonstrate that the evaluation is unreasonable. *Houston Films, Inc.*, B–184402, December 22, 1975, 75–2 CPD ¶ 404 at 14–15.

■ The Navy's technical judgments regarding compliance with the COR are entitled to substantial deference by this Court and must be upheld unless these judgments are clearly without a reasonable basis. *See, e.g., Textron, Inc. v. Adams*, 493 F.Supp. 824, 836 (D.D.C.1980); *Servo Corporation of America*, B–193240, May 29, 1979, 79–1 CPD ¶ 380 at 16. After careful review of the entire administrative record and the arguments made by plaintiff, nothing here convinces the Court that the Navy's determinations were without rational basis. Accordingly, the Court finds that the Navy acted rationally and reasonably when it concluded that Prudential-Maryland failed to meet the Minimum Technical Requirements of the COR.

D. The Navy Had a Rational Basis for Determining that NASSCO's Proposal Met the Minimum Technical Requirements

Prudential-Maryland claims that the Navy improperly evaluated the NASSCO proposal when it found that it met the minimum technical requirements. Plaintiff relies on the fact that the Ship Characteristics Evaluation Team—the lowest tier of the source selection process—initially voiced concerns about NASSCO's proposal in the areas of superstructure strength calculations and emergency electrical (generator and switchboard) arrangements and felt that NASSCO might not be able to meet the ABS and U.S. Coast Guard requirements in these areas. On the ground that higher-tier bodies do not have "any authority to overrule the findings of the Technical Evaluation Teams," Plaintiff's Motion for Summary Judgment at 41, Prudential-Maryland argues that the Source Selection Authority "was precluded by the findings of the Ship Characteristics Evaluation Team, under the authority delegated to it by the Phase II Source Selection Plan, from finding that the NASSCO proposal met the minimum requirements of the COR...." *Id.* at 40.

■ It is plain, however, that the Phase II Source Selection Plan stated that each level in the source selection process had review authority over the conclusions of the level below it. *See* A.R., Tab 19, at 4, ¶ 1.c(3)(b), *id.* at 12, ¶ 4.4.2.b (TERP has review authority over technical evaluation teams); *id.* at 4, ¶ 1.c(2)(b), *id.* at 13, ¶ 4.4.3 (SSRB has review authority over TERP); *id.* at 3, ¶ 1.c(1)(g) (SSA has review authority over SSRB). It is also well settled that higher levels in a source selection process are free to disagree with the judgment of lower-level staff, even if the lower levels are more intimately involved with the technical details of the evaluation. As the Comptroller General has stated:

[W]e have recognized that selection officials are not bound by the recommendations made by evaluation and advisory groups.... This is so even though it is the working level procurement officials and evaluation panel members who may normally be expected to have the technical expertise relevant to the technical evaluation of proposals.

*Grey Advertising, Inc.*, B–184825, May 14, 1976, 76–1 CPD ¶ 325 at 11, *citing to Bell Aerospace Co.*, 55 Comp.Gen. 244 (1975), *Tracor Jitco, Inc.*, 54 Comp.Gen. 896 (1975).

■ The Court also notes that the Navy had a rational basis for its decision on the points relating to ABS and Coast Guard certification. The Phase II RFP stated:

The *inability* to meet the minimum requirements in the following areas will

render the offeror's proposal technically unacceptable:

\* \* \* \* \* \*

b. Meet ABS classification and USCG certification requirements (COR, Section 6.1.)

A.R., Tab 16 at 121 (emphasis added). While the bottom-tier Ship Characteristics Evaluation Team initially expressed serious concerns about whether the NASSCO ship would be able to meet the ABS and Coast Guard requirements in the areas of superstructure strength calculations and emergency electrical arrangements, after discussions with the Chairman of the TERP, both the individual evaluator responsible for these areas and the leader of the Ship Characteristics Evaluation Team concluded that they could *not* make a certain determination whether the ABS and Coast Guard would approve the NASSCO arrangements. Cameron Deposition Transcript at 67, 70. The higher-level bodies in the source selection process (the TERP and the SSRB) also concluded that they could not say that the NASSCO ship would be unable to meet the ABS and Coast Guard requirements because the decision as to compliance involved interpretation of the ABS and Coast Guard regulations. Cameron Deposition Transcript at 69–70; Mortimer Deposition Transcript at 206–07, 228, 231–33. They therefore concluded that the final decision as to compliance with the ASB and Coast Guard requirements was best left to those regulatory bodies, A.R., Tab 31 at 1, particularly in light of the fact that NASSCO, not the Navy, would have to pay for any modifications necessary to obtain approval. The Court finds Navy's conclusions here to be rational and reasonable.

E. The Navy Conducted Meaningful and Adequate Discussions with Prudential-Maryland

■ Prudential-Maryland claims that the Navy failed to conduct meaningful discussions with it prior to the award of the Phase II contract, pursuant to 10 U.S.C. § 2304(g) and DAR §§ 3–805.1, 3–805.3. The Navy conducted discussions with both NASSCO and Prudential-Maryland in the form of written questions from the Navy to each offeror, identifying the areas of concern and asking that the items be rectified; responding to submissions by each offeror; and face-to-face meetings with each offeror to discuss the various points. In its written submissions to Prudential-Maryland, the Navy identified each item that it later found to be a significant deficiency in the Prudential-Maryland proposal. On these facts, it cannot be said that the Navy treated Prudential-Maryland unfairly or failed to conduct the discussions required by law.

■ Prudential-Maryland complains that the Navy's advice on each item was not sufficiently specific. It is clear, however, that a procuring agency is not required to tell offerors how to rectify their deficiencies. The agency need only alert offerors of the deficient areas and let each offeror decide how best to solve the problems. *See, e.g., E-Systems, Inc.*, B–191346, March 20, 1979, 79–1 CPD ¶ 192 at 9 ("There is no fixed, inflexible rule regarding the requirement for discussions.... [Statements] made during oral discussions which lead offerors into areas of their proposals that are unclear are sufficient to alert offerors to deficiencies in their proposals."); *Ford Aerospace & Communications Corp.*, B–200672, December 19, 1980, 80–2 CPD ¶ 439 at 21–22 (agency did not fail to conduct "meaningful discussions" simply because it failed to inform offeror that two aspects of its proposed approach were high risks).

F. Adequacy of Time to Submit Phase II Proposals

■ Prudential-Maryland also claims that it was not given sufficient time to submit its Phase II proposal. But Prudential-Maryland and NASSCO had precisely the same amount of time: The Navy made the Phase II RFP (including the evaluation factors) available to both offerors at the same time; both offerors had the same opportunities to question the Navy about the RFP and to obtain clarifications of the RFP from the Navy; both offerors had

equal time to prepare their initial Phase II proposals; both offerors received simultaneous written notifications from the Navy of areas where the Navy felt the initial proposals were deficient or needed clarification; both offerors had the same opportunities to respond to the Navy's notifications; both offerors had the same opportunities to discuss their initial proposals orally, and, in fact, both held such discussions on the same days; and both offerors had the same amount of time in which to prepare and submit their "best and final" proposals. It cannot be said that Prudential-Maryland was in any way prejudiced vis-a-vis NASSCO by the Navy's schedule for the submission of proposals.

## G. Lack of Stated Delivery Date Not Improper

■ Prudential-Maryland claims that the Navy violated DAR 1–305.2(a) by not imposing a fixed delivery date on both offerors. DAR 1–305.2(a) provides that "[t]he time of delivery or performance is an essential element for inclusion in a contract and must be clearly set forth in invitations for bids and requests for proposals." DAR 1–305.2(a). The regulation also states that "[d]elivery and performance schedules shall be designed to *meet the requirements* of the *particular procurement,* with due regard to all relevant factors...." *Id.* Prudential-Maryland claims that this regulation, by its terms, requires the inclusion of a delivery date in the contract. The Navy, however, has interpreted DAR 1–305.2(a) to mean that a delivery date need not be specified in a RFP and that a flexible delivery date is satisfactory. It has been the practice of the Navy to permit offerors to propose delivery schedules that are most economical for them. *See* Reply to Plaintiff's Opposition to Defendants' Motion for Summary Judgment, Exhibit 1, Ship Acquisition Policy Advisory Council Memorandum No. 5.5.2 (Oct. 12, 1979); O'Neill Deposition Transcript at 92–93, 172–73. The Comptroller General has upheld the policy that delivery schedules need not necessarily be evaluated. *See, e.g., Le Prix Electrical Distributors, Ltd.,* B–207106, September 21, 1982, 82–2 CPD ¶ 249 at 3. The Court, therefore, finds that the absence of a stated delivery date for the hospital ship was not in violation of DAR 1–305.2(a).

## H. Modification to the NASSCO Contract Not Improper

■ Prudential-Maryland also claims that Modification P00001 to the contract between NASSCO and the Navy improperly permitted NASSCO to substitute other vessels for the San Clemente class tankers that NASSCO had undertaken to convert. The Court notes that Modification P00001 does not state that NASSCO may substitute different vessels, it merely requires NASSCO to use its "best efforts" to acquire the vessels to be converted from the seller, Apex Marine Corp., at a lower price than the price that NASSCO has previously negotiated with Apex. The Navy Contracting Officer who drafted and signed the Modification has stated that the Modification does not allow NASSCO to substitute vessels. *See* Affidavit of Kevin J. O'Neill, Oct. 31, 1983, ¶ 11; O'Neill Deposition Transcript at 156–61. The Modification thus was not so extensive as to render the modified contract illegal. Moreover, as the higher priced offeror, Prudential-Maryland was in no way prejudiced by this Modification.

## I. Navy's Discussions with NASSCO Not Improper

Prudential-Maryland also argues that (1) the communications between the Navy and NASSCO that led to Modification P00001 constituted unilateral discussions between the Navy and NASSCO concerning NASSCO's proposal; (2) under DAR 3–805.3, Prudential-Maryland should have had a chance to engage in similar discussions with the Navy; and (3) the Navy should have called upon both offerors to submit another round of "best and final offers."

■ The record shows, however, that the Navy and NASSCO entered into communications concerning the price NAS-

SCO had planned to pay Apex for the tankers that were to be converted after the Navy's evaluation of the competing proposals, after the selection of NASSCO for the award, and after the Navy's execution of its internal Business Clearance Memorandum for the award to NASSCO. Modification P00001 was effective on the same day the Navy awarded the hospital ship contract to NASSCO. The Modification had no bearing on the Navy's decision to award the contract to NASSCO rather than Prudential-Maryland; NASSCO's agreement to Modification P00001 was not a condition for the award; and the award was not contingent on NASSCO's obtaining any reduction in the acquisition price of the unconverted vessels. Under these undisputed facts there were no improper discussions that would have called for another round of "best and final offers" under DAR 3–805. As decisions of the Comptroller General establish, communications between the offeror selected for award and the procuring agency that take place after the selection but before the award and that involve adjustments in the contract terms do not constitute "discussions" and are entirely proper. *See Environmental Enterprises, Inc.,* B–193090, March 9, 1979, 79–1 CPD ¶ 168 at 2 (Comptroller General could not "fault EPA for conducting discussions with [the winner] again, since [the winner] had already been selected for award, and the purpose of the discussions was only to obtain a slight reduction in the offered price"); *C3, Inc.,* B–206881, May 14, 1982, 82–1 CPD ¶ 461 at 14 (post-selection, pre-award amendments to the contract terms were proper because they were related to subjects already "contemplated by the contract" and were "not essential to the acceptability" of the winner's proposal); *Con-Diesel Mobile Equipment Division,* B–201568, September 29, 1982, 82–2 CPD ¶ 294 at 12 ("we generally will not object to a [post-selection, pre-award] change in contract terms that is within the scope of the contract").

### Conclusion

Plaintiff has made a number of other miscellaneous arguments which it claims supports the position that only Prudential-Maryland should have been awarded the Phase II T–AH(X) hospital ship contract. The Court, however, finds these arguments to be without merit.

This Court has carefully reviewed the administrative record and all the papers submitted in this action. Based on these papers, as well as the reasons outlined in this opinion, the Court finds that the Navy had a reasonable and rational basis for its decision in awarding the contract to NASSCO.

Accordingly, the Court grants defendants' and intervenor-defendant's motion for summary judgment and denies plaintiff's motion for summary judgment.