CACI FIELD SERVICES,
INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 302–87C.

United States Claims Court.

Nov. 23, 1987.

Peter M. Kilcullen, Washington, D.C., for plaintiff. Charles P. Revoile and Daniel J. Donohue, Washington, D.C., of counsel.

Elizabeth S. Woodruff, with whom were Asst. Atty. Gen. Richard K. Willard, David M. Cohen, and Thomas W. Petersen, Washington, D.C., for defendant.

## OPINION

BRUGGINK, Judge.

In this pre-award bid protest case filed pursuant to 28 U.S.C. § 1491(a)(3) (1982), plaintiff CACI Field Services, Inc. ("CACI") seeks: (1) a declaration that Request for Proposals ("RFP") No. FCGA–S7–XV333–N was fatally defective under Federal Acquisition Regulations ("FAR") subpart 15.6 because it failed to set forth the significant evaluation factors and subfactors and their relative order of importance; (2) a declaration that defendant's consideration of plaintiff's submission of a proposal under the RFP was in violation of the implied contract of fair and honest consideration of offers in accordance with applicable statutes and regulations, thereby entitling plaintiff to recovery of its bid preparation costs; (3) a declaration that the evaluation of plaintiff's technical proposal was not conducted in accordance with applicable laws and regulations; (4) a declaration that the evaluation of plaintiff's technical proposal was contrary to the applicable laws and regulations and had no rational basis, and that defendant be enjoined from rejecting plaintiff's technical proposal; and (5) an injunction against cancellation of the RFP (reinstatement of the RFP), enjoining the defendant to proceed with further consideration of plaintiff's price proposal.

Upon consideration of the evidence presented at trial, the parties' submissions, and the applicable law, the court concludes for the reasons stated herein that plaintiff's requested relief should be denied.

## FACTUAL BACKGROUND

On August 22, 1986, the General Services Administration ("GSA") issued RFP No. FCGA–S7–XV333–N requesting submission of proposals for the operation of the GSA Wholesale Distribution Center ("WDC"), including the Customer Supply Center ("CSC"), located in Stockton, California. The solicitation was issued in accordance with Office of Management and Budget ("OMB") Circular A–76,[1] and entailed operation of the Stockton WDC[2] for a twelve-

---

1. In A–76 solicitations, a cost comparison is made to determine whether accomplishing the specified work by contract with the private sector or by Government performance is more economical; the Government is, therefore, always one of the offerors in an A–76 solicitation. See generally International Graphics, Div. of Moore Business Forms, Inc. v. United States, 4 Cl.Ct. 186, 196 n. 12 (1983). The RFP declared that if Government performance was determined to be more economical, the solicitation would be cancelled and no contract would be awarded.

2. The Stockton WDC, operated by GSA personnel, is part of GSA's national supply network and stocks a general range of common use items such as office supplies, office devices, paper and paper products, building supplies, cleaning supplies, paint, sealants and adhesives, tools, and miscellaneous hardware. The WDC provides these items to all civilian and military agencies in the states of California, Nevada,

month period beginning ninety days after notification of award of the contract and for two additional twelve-month periods exercisable at the option of the Government. Section L of the RFP details the information required to be submitted in response to the solicitation, including a description of the mandatory requirements/technical discussion (volume II of a bidder's proposal). Section M contains the evaluation factors and subfactors relevant to the solicitation:

1. This solicitation will be evaluated to determine the best offer award to cover three (3) areas of activity: warehouse operations, building operations and maintenance, and custodial services. The Government intends to make an award in the aggregate.

2. A Technical Evaluation Panel will be convened to review and rate the technical proposals. Evaluation of technical proposals will be based on the offerors [sic] response to the technical criteria of this Request for Proposal. Those offers considered satisfactory or above will be subject to an evaluation of price proposals. The offer rated overall best for the Government considering both technical and price will be the winning offer. The winning offeror's prices will be competed against the Government MEO [Most Efficient Operation], using the procedures in Circular A–76. Offerors are requested to initially submit proposals to the Government on the most favorable terms from a technical and price standpoint. The relative order of importance is as shown below:

A. Technical, including Mandatory Requirements, Technical Discussions, Organization and Staffing.

B. Price.

3. *Technical Evaluation:* The Government will evaluate the offers, in the aggregate for all services listed herein. Failure of an offer to provide a satisfactory offer in any one element will result in an unsatisfactory rating. Those offerors that indicate a greater understanding of the requirements and provide a more effective management plan will be rated higher than less advantageous proposals.

A. *Management and Plan of Operation.*

(1) *Organization Plans.*—Structure proposed; delegation of authority; lines of authority and responsibility for the performance of work; the authority of local management and the crafts, skills and supervision available for local performance; personnel practices and management controls over the work force.

(2) *Subcontracting Plans.*—The proposed mix and use of the offerors [sic] own personnel verses [sic] subcontracted work and the procurement policies and procedures to be followed in awarding contracts.

(3) *Operational Plans.*—Proposed for effective internal control of assigned work; estimating and scheduling of work; resources assignment; timeliness, quality and responsive execution of work.

(4) *Quality Control Plan.*—The proposed methods and techniques for detection and correction of deficiencies, capability of responding to service requirements.

(5) *Work Schedules.*—The proposed plan for submission of required schedules and methods of daily assignments of work.

(6) *Phase-in and phase-out Plan.*—The proposed plans for orderly phase-in and out of the contractor work force and programs.

B. *Offerors Experience and Qualifications.*

(1) *Corporate.*—Reputation and experience of the corporation in managing similar facilities of size, and complexity.

(2) *Key Personnel.*—Appropriateness of positions and skills designated by the offerors as Key Positions; the qualifications proposed or detailed for Key Posi-

Arizona, Washington, Oregon, Idaho, Alaska, and Hawaii, and the Pacific and Far East market areas.

tions and the submission of specific nominations for Key Positions where possible.

On December 5, 1986, CACI timely submitted a four-volume technical and price proposal to GSA in response to the solicitation. On December 8, 1986, Jeanne Deck, the contracting officer ("CO"), convened a six-member technical review panel ("TRP") to review the technical proposals of all offerors. On approximately December 12, 1986, upon completion of their initial evaluations, the TRP members submitted to the CO their individual comments and the panel's summary comments regarding the technical proposal of each offeror. The TRP members' comments were based on nine evaluation factors contained in an informal source selection plan ("SSP"): [3] (1) mandatory requirements/technical discussion (supply distribution); (2) key personnel, corporate experience (supply distribution); (3) contingency and phase-in (supply distribution); (4) mandatory requirements/technical discussion (building maintenance/custodial); (5) key personnel, corporate experience (building maintenance/custodial); (6) contingency and phase-in (building maintenance/custodial); (7) mandatory requirements/technical discussion (security); (8) key personnel, corporate experience (security); and (9) contingency and phase-in (security). On January 14, 1987, the chairman of the TRP sent a technical ranking list to the CO presenting the numerical scores given to each offeror on each of the nine SSP evaluation factors; CACI received the highest ranking (with a total of 870.5 out of 1000 possible points).[4] According to the SSP, this score placed CACI within the "superior range." [5]

On February 9, 1987, based upon a comparison of the narrative comments of the TRP members and the numerical scores given by the panel members to each SSP evaluation factor for the various proposals, the CO requested the chairman of the panel to consider whether there was any inconsistency between the comments and the scoring and, if so, to advise whether it was necessary to reconvene the TRP. In a memorandum to Jeanne Deck dated February 10, 1987, the chairman of the TRP concluded that "some of the evaluators in some cases assigned a numerical rating for some factors which were inconsistent with the comments. In general, numerical ratings may have been overly generous considering the importance of the shortcoming or deficiency identified in the comment." The TRP chairman recommended that the four Federal Supply Service ("FSS") members of the TRP [6] reconvene to reconcile any inconsistencies. On February 18, 1987, the FSS panel members reconvened and, in addition to providing a technical ranking list with revised numerical scores,[7] stated:

3. The SSP, which was partially prepared by the CO, was finalized on September 9, 1986. Because the solicitation was not a "formal" source selection within the terms of FAR § 15.612, 48 C.F.R. § 15.612 (1986), the CO referred to the SSP during direct examination at trial as being "informal." Nevertheless, it is undisputed that the TRP utilized the nine SSP evaluation factors in formulating their comments and numerical scores on all proposals.

4. At trial, the CO stated that she used the numerical ratings only to rank the various offers. After the initial ranking, she based her conclusions upon the technical comments rather than upon a numerical score. Nevertheless, on March 2, 1987, the CO apparently relied in part upon revised numerical scores when she determined that all offerors except CACI were technically unacceptable.

5. The SSP provides that a "superior" proposal "exceeds the minimum requirements and/or shows ability beyond the minimum requirements."

6. Four members of the TRP were employees of the FSS with experience in warehousing. These four panel members reviewed the proposals with respect to the six SSP evaluation factors relating to supply distribution and to security. The two remaining TRP members were employees of the Public Building Service. These two panel members reviewed the proposals with respect to the six SSP evaluation factors relating to building maintenance/custodial and to security.

7. CACI's revised score was 803.5 points out of a possible 1000 points; CACI remained the highest ranking offeror. According to the SSP, CACI's revised score placed it within the "satisfactory" range. A "satisfactory" proposal met "the established minimum requirements for each element."

As a general observation, we have concluded that the single most significant rating factor is "staffing to workload." Failure to provide sufficient people to accomplish the workload identified in the statement of work strongly indicates a serious deficiency which bears directly on the offeror's non-comprehension of the requirements, the workload, the labor intensive nature of the workload and indeed the offeror's capability to manage an operation of this scope....

On March 2, 1987, based upon her review of the TRP's numerical rankings and the wide disparity between CACI's ranking and the rankings of the remaining offerors, the CO determined that all offerors except CACI were "out of the competitive range and technically unacceptable for the purpose of conducting oral or written discussions." On March 19, 1987, the CO sent a letter to John H. Baker, President of CACI, outlining eight areas in CACI's technical proposal that required "further clarification and detail." [8] These eight areas were personnel, operational plans, phase-in, corporate experience, subcontractors, safety training, staffing level, and contingency plans. On March 26, 1987, CACI responded to the CO's request for clarification and detail by providing additional information and revisions to those sections of its proposal relating to the eight questioned areas.

Between April 1 and April 3, 1987, the four FSS panel members reconvened to review the information provided by CACI. On April 2, 1987, the CO telephoned CACI and asked for additional information—to be provided that day—regarding CACI's corporate experience and staffing proposals. Accordingly, on April 2nd, CACI telecopied additional information to the CO pursuant to her request, including a breakdown of its proposed full-time and part-time employee staffing hours and a description of its ongoing warehouse contracts. The four

FSS panel members thereafter provided written review comments to the CO regarding CACI's additional information submitted on March 26 and April 2, 1987.

On April 7, 1987, the CO sent a letter to CACI requesting additional information in five areas: staffing, material handling equipment ("MHE"), subcontractors, forklift operators, and key personnel. On April 14, 1987—the deadline given in the April 7th letter [9]—CACI submitted additional information for each of the five areas. This information was reviewed by the four FSS panel members on approximately April 21, 1987; narrative comments and revised numerical scores were provided to the CO. The panel members' comments evince significant concerns over CACI's ability to perform under the solicitation. For example, regarding CACI's intended use of supply clerks at the Stockton WDC, the TRP stated, "There is serious question as to whether CACI could successfully utilize lower pay scale employees to perform higher wage scale functions on a regular basis without serious labor relations and production problems." Regarding CACI's use of material handling equipment, the TRP stated:

CACI's response to this question raises serious questions about their understanding of the nature and volume of the Stockton workload and the requirement to perform many operations which require forklifts at widely dispersed locations simultaneously.... The technical review team believes that CACI would need between 75 to 100 percent more MHE than they are currently proposing.

Regarding CACI's use of forklift operators, the TRP stated, "Our level of confidence in CACI's staffing to workload has been undermined by their identification of the hours per month that part-time employees will be used. We are further disillusioned by CACI's description of the num-

---

**8.** The letter was actually hand-delivered by the CO to three CACI representatives at a meeting held on March 19, 1987. At the meeting, the CACI representatives were permitted to ask questions regarding the information being sought.

**9.** The April 7, 1987 request for additional information, as well as the March 19, 1987 request for additional information, included the remark, "Failure to submit a complete response by this date will result in your offer being determined to be technically unacceptable."

ber of forklift operators/warehousemen CACI proposed and the workload to be accomplished at many locations which require the use of forklifts." In its evaluation of CACI's corporate experience,[10] the TRP stated:

CACI appears to be basing its corporate experience on Joe Fidd's [CACI's original proposed Center Manager for the Stockton WDC] military experience in the late 1970s and early 1980s. They still have failed to demonstrate to this panel that they have, as a corporation, operated a comparable facility in scope, complexity and size as the Stockton WDC. Given that CACI is heavily relying on key personnel for corporate experience, the question automatically arises, what will CACI have to fall back on in terms of corporate experience should key personnel leave or be absent for protracted periods of time? Without any comparable corporate experience the technical review team has serious doubts as to CACI's ability to perform under this solicitation. Although CACI has *written* a satisfactory response in the other areas of evaluation, this one serious deficiency, corporate experience, gives the technical review team a very low confidence level in CACI's ability, and as such would raise serious doubts on their ability to perform.

In this regard the original CACI proposal was a well written document that appeared to present a good understanding of the requirements of the solicitation. CACI identified themselves in their original proposal as "an international professional and high technology services organization.... Founded in 1962[,] ... we are a leader in such diversified areas as operation and maintenance of major warehousing and distribution facilities....["] When asked for specific information it became evident that CACI in fact had no comparable corporate experience. A detailed analysis of their proposal raised questions as to their ability to perform since they had no similar corporate experience of a comparable nature. As questions were raised and CACI submitted additional data to clarify their proposal, it became even clearer CACI failed to understand the magnitude of the Stockton WDC. With each additional item raised concerning the CACI proposal the picture [became] more cloudy as to their understanding of the Stockton operation. Had CACI evidenced comparable corporate experience, they would have been able to easily address each concern.

In summary, CACI has not clearly demonstrated in writing that they would be able to perform in accordance with the summary of requirements based on the explanation that they provided to inquiries that resulted in serious questions as to whether CACI fully comprehended the nature, volume, scope and complexity of the Stockton workload.

On April 23, 1987, the CO telephoned CACI and requested an April 29, 1987 oral briefing on its technical proposal and management approach. According to plaintiff, the CO stated during this telephone conversation that no members of the TRP would be present at the briefing. In fact, at least one TRP member was present.[11] During the meeting, CACI presented information on corporate experience, proposed use of MHE, staffing, the ratio of part-time to full-time employees, key personnel, phase-in, CACI's understanding of the Stockton operations, and several other subjects. CACI was also asked questions by several GSA personnel present at the meeting, including the CO and the chairman of the TRP. The meeting was recorded on audio tape and a transcript was prepared.

---

**10.** The April 7, 1987 letter from the CO to CACI did not ask for additional information on corporate experience. The FSS panel members, however, included an addendum on corporate experience in their review comments of CACI's April 14, 1987 response.

**11.** In a memorandum for record prepared after the telephone conversation, C.D. Walden, Vice-President of CACI, stated, "I interpret this as type of orals per FAR. Thus we will put together full blown technical pitch, prepare for questions and maybe we can finally find out if we have any deficiencies in our proposal."

Following the April 29th meeting, the TRP prepared several comments on the information presented by CACI during the briefing. As a preamble to its specific comments, the TRP stated:

[I]t is the conclusion of the technical review team that the CACI briefing and question responses has not in any manner elevated the quantitative or qualitative level of the offer. As indicated in the detail contained herein the technical review team reaffirms its position that we have serious doubts on CACI's ability to perform under this solicitation.

On May 1, 1987, as requested during the April 29th meeting, CACI sent a letter to the CO providing information on two key personnel. On May 4, 1987, CACI furnished the CO with proposal revision pages that reflected the changes to key personnel discussed in the May 1st letter. Three days later, on May 7, 1987, the CO sent CACI a letter indicating that its offer had been rejected:

This is to advise you that your technical proposal has been determined to be unacceptable in accordance with FAR 15.610. The following outline highlights the major areas of your offer which have been determined to be unacceptable:

1. No previous corporate experience of the scope and complexity of the Stockton Wholesale Distribution Center.

2. Failure to demonstrate an understanding of the scope and requirements of the Performance Work Statement (PWS). (Proposed staffing, material handling equipment and labor mix failed to demonstrate an understanding of the complexity of the operation).

3. Lack of relevant experience by the proposed key personnel.

Also on May 7, 1987, the CO, with the concurrence of several other GSA employees, cancelled the solicitation covering the Stockton WDC and CSC. The solicitation was cancelled based on the CO's determination that none of the offers received were technically acceptable. This cancellation was communicated to CACI on May 8, 1987.

CACI filed its complaint on May 27, 1987. Trial was held August 19–21, 1987.

### DISCUSSION

I. *Standard of Review*

Although this court possesses the authority to grant complete equitable and monetary relief in pre-award government contract cases [12] brought by disappointed bidders, 28 U.S.C. § 1491(a)(3) (1982),[13] the standard of review in such cases is extremely limited. Contracting officers may properly exercise wide discretion in their evaluation of bids and in their application of procurement regulations. *Electro-Methods, Inc. v. United States*, 7 Cl.Ct. 755, 762 (1985). As stated in *Baird Corp. v. United States*, 1 Cl.Ct. 662, 664 (1983):

The court should not substitute its judgment on such matters for that of the agency, but should intervene only when it is clearly determined that the agency's determinations were irrational or unreasonable. It is the burden of the aggrieved bidder to demonstrate [through clear and convincing evidence] that there was no rational basis for the agency's determinations.

(citations omitted); *see also Drexel Heritage Furnishings, Inc. v. United States*, 7 Cl.Ct. 134, 142 (1984). Alternatively, for this court to grant the requested relief, CACI must show that the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations. *Kentron Hawaii, Ltd. v. Warner*, 480 F.2d

---

**12.** Because no award has been made with respect to the Stockton WDC solicitation, CACI's claim falls within the definition of a pre-award claim. *See Kinetic Structures Corp. v. United States*, 6 Cl.Ct. 387, 392 (1984).

**13.** The court's pre-award equitable jurisdiction is grounded on the Government's implied contract to fully and honestly consider all bids. *See United States v. John C. Grimberg Co.*, 702 F.2d

1362, 1367–68 (Fed.Cir.1983); *CACI, Inc.–Federal v. United States*, 719 F.2d 1567, 1573 (Fed.Cir. 1983); *Keco Indus., Inc. v. United States*, 192 Ct.Cl. 773, 780, 428 F.2d 1233, 1237 (1970); *Heyer Prods. Co. v. United States*, 135 Ct.Cl. 63, 69–71, 140 F.Supp. 409, 412–14 (1956); *Ingersoll–Rand Co. v. United States*, 2 Cl.Ct. 373, 375 (1983).

1166, 1169 (D.C.Cir.1973); *DeMat Air, Inc. v. United States,* 2 Cl.Ct. 197, 202 (1983). The proven violation of a law or regulation does not, however, necessarily provide a ground for relief; CACI "must show that a violation denied it the impartial consideration to which it was entitled under the implied contract obligations of the government." *Arrowhead Metals, Ltd. v. United States,* 8 Cl.Ct. 703, 714 (1985) (citations omitted).

Furthermore, "the degree of proof necessary to overturn procurement determinations is related to the amount of discretion vested in the administrative official whose actions are challenged." *Hayes Int'l Corp. v. United States,* 7 Cl.Ct. 681, 685 (1985). In negotiated procurements, such as the solicitation presently at issue, "contracting officials have been accorded broad discretion in the process of obtaining the contract most beneficial to the government." *Id.; see also Action Mfg. Co. v. United States,* 10 Cl.Ct. 474, 478 (1986); *Electro–Methods,* 7 Cl.Ct. at 762; *Drexel Heritage,* 7 Cl.Ct. at 142–43; *DeMat,* 2 Cl.Ct. at 202.

Keeping in mind CACI's heavy burden of proof and the limited scope of review of the CO's decision, the court now examines CACI's specific allegations.

## II. *RFP Evaluation Factors*

CACI argues that the RFP was defective under the Competition in Contracting Act of 1984 ("CICA"), 41 U.S.C. § 253a(b)(1) (Supp. II 1984),[14] and FAR sections 15.-605(e) and 15.406–5(c), 48 C.F.R. §§ 15.-605(e), 15.406–5(c) (1986).[15] Specifically, CACI alleges that the RFP's evaluation factors and subfactors, and their relative importance, are not clearly stated in Section M of the RFP.

 Both the FAR and CICA require evaluation factors and significant subfactors to be clearly stated within the RFP, including a statement of the relative importance of such factors and subfactors. *See Compuware Corp.,* GSBCA No. 8869–P, 87–2 BCA ¶ 19,781, at 100, 102–03; *Genasys Corp.,* GSBCA No. 8734–P, 87–1 BCA ¶ 19,556, at 98,848; *Devres, Inc.,* B–224017, Dec. 8, 1986, 86–2 CPD ¶ 652, at 3. The precise numerical weight to be used in the evaluation need not be disclosed, however. *Technical Servs. Corp.,* B–214634, Feb. 7, 1985, 85–1 CPD ¶ 152, at 13; *BDM Servs. Co.,* B–180245(1), May 9, 1974, 74–1 CPD ¶ 237. Paragraph M.2 of the RFP includes two evaluation factors: (A) "Technical, including Mandatory Requirements, Technical Discussions, Organization and Staffing"; and (B) "Price." Because the factors were listed in order of importance, the technical aspect of CACI's proposal was to receive greater weight. At trial, CACI Vice President C.D. Walden testified that he interpreted paragraph M.2 as containing four evaluation factors: mandatory requirements/technical discussions, organization, staffing, and price. Transcript at 312–13. Walden also testified that he believed these four factors were listed in order of importance. *Id.* The plain language of paragraph M.2, however, supported by the testimony of the CO, indicates that only two evaluation factors—technical and price—are listed in subparagraphs A and B. Assuming that CACI's interpretation of

**14.** Section 253a(b) provides, in relevant part: [E]ach solicitation for ... competitive proposals ... shall at a minimum include—
(1) a statement of—
(A) all significant factors (including price) which the executive agency reasonably expects to consider in evaluating ... competitive proposals; and
(B) the relative importance assigned to each of those factors....

**15.** FAR § 15.605(e) provides:
The solicitation shall clearly state the evaluation factors, including price or cost and any significant subfactors, that will be considered in making the source selection and their rela-

tive importance (see 15.406–5(c)). Numerical weights, which may be employed in the evaluation of proposals, need not be disclosed in solicitations. The solicitation shall inform offerors of minimum requirements that apply to particular evaluation factors and significant subfactors.
FAR § 15.406–5(c) ("Section M, Evaluation factors for award") provides:
Identify all factors, including price or cost, and any significant subfactors that will be considered in awarding the contract ... and state the relative importance the Government places on those evaluation factors and subfactors.

paragraph M.2 indicated that the list of evaluation factors was, at most, ambiguous, the burden was on CACI to seek a clarification from the CO regarding that ambiguity. *See J.A. Jones Constr. Co. v. United States*, 184 Ct.Cl. 1, 13, 395 F.2d 783, 790 (1968); *Beacon Constr. Co. v. United States*, 161 Ct.Cl. 1, 6–7, 314 F.2d 501, 504 (1963); *Harris Data Communications, Inc. v. United States*, No. 87–937, slip op. at 5 (Fed.Cir. Aug. 26, 1983) (unpublished) [723 F.2d 69 (table)]. Given the specific language of paragraph M.2, however, the court does not believe that the evaluation factors are ambiguous. There are *two* subparagraphs (A and B) to paragraph M.2, each containing one evaluation factor. Moreover, the "Technical" evaluation factor is specified as *"including"* the other criteria listed in subparagraph A.[16] The two evaluation factors, particularly when read within the context of the subfactors listed in paragraph M.3, are clearly stated. The relative order of importance of the evaluation factors is also explicitly set forth in paragraph M.2—technical is more important than price.

CACI further alleges that the RFP contains no statement of significant subfactors and their relative importance.[17] Paragraph M.3 of the RFP is entitled "Technical Evaluation" and paragraph M.4 is entitled "Price Evaluation." CACI argues that paragraph M.3 cannot be a list of evaluation subfactors because no relationship exists between that paragraph and paragraph M.2.A.[18] Several facts indicate, however, that paragraph M.3 is a clear statement of subfactors: (1) paragraphs M.3 and M.4 directly correspond to the two evaluation factors—technical and price—contained in paragraph M.2; (2) the first sentence of paragraph M.3 states that the Government would evaluate the offers with respect to the elements listed in the paragraph; (3) the third sentence of paragraph M.3 indicates that proposals will be rated higher to the extent they respond to the items listed in the paragraph; (4) Mr. Walden testified that paragraph M.3 consisted of "additional details on the government's things they intended to look at and evaluate," Transcript at 450–51; and, most significantly, (5) paragraph M.3 appears in Section M of the solicitation ("Evaluation Factors for Award").

The relative importance of the subfactors is also shown. The second sentence of paragraph M.3 indicates the relative importance of the eight subfactors.[19] It states, "Failure of an offer to provide a satisfactory offer in any one element will result in an unsatisfactory rating." A proposal had to comply with all eight subfactors to be considered acceptable.[20] As the CO testified, these subfactors were therefore equally important because failure to comply with any one subfactor would render a proposal unacceptable. The court concludes that the subfactors are clearly stated in Section M of the RFP and that the relative importance assigned to each subfactor is also indicated.

16. The phrase "including Mandatory Requirements, Technical Discussions, Organization and Staffing" could be interpreted as constituting technical subfactors. Given that ¶ M.3 is more obviously a breakout of subfactors, the court is of the opinion that the phrase merely describes what the technical portion of the proposal must include and does not set forth additional evaluation factors.

17. Although CACI seemed to concede in its pretrial memorandum of law that ¶ M.3 lists the significant subfactors, it stated in its post-trial memorandum of law that "the RFP is totally devoid of any statement of significant subfactors." The court will therefore consider this argument.

18. CACI argues that ¶ M.3 cannot be a statement of subfactors because the technical factors stated in ¶ M.2.A are contained in Volume II of the proposal whereas the elements of ¶ M.3 are contained in Volume IV. The court is unaware, however, of any regulations or case precedent requiring all discussion of evaluation subfactors to be contained in one volume of a proposal; CACI did not point out any such regulation or precedent.

19. The eight subfactors listed in ¶ M.3 are: organization plans, subcontracting plans, operational plans, quality control plan, work schedules, phase-in and phase-out plan, corporate experience, and key personnel qualifications. A brief explanation accompanies each subfactor.

20. CACI did not argue that this requirement was unreasonable.

III. *Source Selection Plan Evaluation Criteria*

The SSP utilized by the technical review panel during its evaluation process contained nine evaluation factors. CACI argues that these nine factors differed significantly from the evaluation factors listed in the RFP and, therefore, tainted the entire solicitation. In a formal source selection process, FAR section 15.612(b)(3), 48 C.F.R. § 15.612(b)(3) (1986), requires an SSP to be approved before the RFP is issued. In addition, FAR section 15.612(c)(4), 48 C.F.R. § 15.612(c)(4), requires the SSP to contain a statement of the proposed evaluation factors and their relative importance. The source selection authority,[21] however, must use the factors established in the RFP to make the source selection decision. FAR § 15.612(d), 48 C.F.R. § 15.612(d).

At the outset, the court notes that the present solicitation was not a "formal" source selection within the terms of FAR § 15.612(a); a source selection authority was not established. FAR § 15.612 is therefore inapplicable.[22] Accordingly, the fact that the Government prepared the SSP after the RFP is inconsequential. Nevertheless, if the CO utilized the evaluation criteria listed in the SSP rather than the RFP, and if the SSP evaluation factors were significantly different from the RFP evaluation factors (in terms of content and/or relative importance),[23] then CACI would be entitled to relief assuming that it was prejudiced by such actions. *Cf. Benedix Field Eng'g Corp.*, B–219406, Oct. 31, 1985, 85–2 CPD ¶ 496, at 4 (formal source selection); *Digital Radio Corp.*, B–216441, May 10, 1985, 85–1 CPD § 526, at 5, 7; *Lingtec, Inc.*, B–208777, Aug. 30, 1983, 83–2 CPD ¶ 279, at 6.

CACI did not present any evidence establishing that the CO's eventual decision to declare CACI's bid technically unacceptable was based on the evaluation factors listed in the SSP. Even though the TRP utilized the evaluation factors stated in the SSP, the CO is not bound by the recommendations or numerical point scores of the panel. *See Prudential–Maryland Joint Venture Co. v. Lehman*, 590 F.Supp. 1390, 1407 (D.D.C.1984); *Bendix Field Eng'g Corp.*, 85–2 CPD ¶ 496, at 4; *RCA Serv. Co.*, B–208871, Aug. 22, 1983, 83–2 CPD ¶ 221, at 5. As long as the CO relied upon the evaluation factors (and their relative importance) listed in the RFP in making her decisions, the fact that the TRP used different evaluation factors would be immaterial. Based on the CO's testimony, the lack of any opposing evidence, and the presumption of good faith on the part of government officials, *see, e.g., Kalvar Corp. v. United States*, 211 Ct.Cl. 192, 198, 543 F.2d 1298, 1301–02 (1976) (requiring "well-nigh irrefragable proof" to overcome the presumption of good faith dealing), *cert. denied*, 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977), the court finds that the CO utilized the RFP evaluation factors and their relative importance in her decision to declare CACI's proposal technically unacceptable.

Moreover, the nine evaluation factors listed in the SSP were not significantly different from the RFP evaluation factors. The main difference between the two sets of evaluation factors was the inclusion of security as an evaluation factor in the SSP. Security was not a stated evaluation factor in the RFP. Nevertheless, CACI was not prejudiced by an evaluation of its proposal for security. Security was never a concern of the CO or the TRP in their evaluation of CACI's proposal and it was not a ground for rejection. Consequently, even if the inclusion of security as an evaluation factor violated FAR § 15.406–5(c) or § 15.605(e), CACI was not prejudiced by such violation and therefore

---

**21.** The source selection authority in a formal source selection is the official responsible for the final procurement decision. The source selection authority is typically at a management level above that of the CO. FAR § 15.612(a), 48 C.F.R. § 15.612(a) (1986).

**22.** The TRP used the SSP as guidance in its evaluation of proposals and to determine numerical ratings.

**23.** The SSP evaluation factors were not disclosed to any of the bidders.

cannot recover for it.[24] *See Dynalectron Corp. v. United States*, 4 Cl.Ct. 424, 429, *aff'd without opinion*, 758 F.2d 665 (Fed. Cir.1984); *Lingtec, Inc.*, B–208777, Aug. 30, 1983, 83–2 CPD ¶ 279, at 2, 6. The three areas in which CACI's proposal was declared technically unacceptable—corporate experience, failure to demonstrate an understanding of the scope and requirements of the performance work statement ("PWS"), and lack of relevant experience by the proposed key personnel—were all clearly stated as evaluation factors or subfactors in Section M of the solicitation.[25]

CACI has also failed to demonstrate that it was prejudiced by any differences in relative importance between the RFP evaluation factors and the SSP evaluation factors. The principal reason for CACI's failure to demonstrate prejudice is its inability to show that the CO did not follow the RFP evaluation factors and their relative importance in rejecting its proposal. The CO's testimony supports the conclusion that she applied the RFP's evaluation factors and their relative importance to the TRP's narrative comments. In the absence of conflicting testimony or evidence, the court is persuaded that the CO complied with all applicable regulations regarding the use of evaluation factors.

IV. *Nontechnical Evaluators and Allegations of Bias*

■ CACI argues that because nontechnical GSA personnel evaluated CACI's proposal and provided questions and comments for review by the TRP, the plain intent of RFP paragraph M.2 was violated.

First, although paragraph M.2 does state that a TRP will be convened to review and rate the technical proposals, the paragraph does not preclude the CO from seeking advice/assistance from her GSA colleagues. Second, CACI did not point out, nor is the court aware of, any regulations that prevent a CO from seeking such outside advice. Finally, CACI has not argued that it was prejudiced by the review comments of the GSA personnel. There is no evidence that the final decision to reject CACI was not purely the CO's.

■ In addition, CACI alleges that the chairman of the TRP may not have been an independent evaluator because he visited the Stockton WDC prior to the issuance of the RFP to help in the preparation of the Government's MEO estimate. The TRP chairman testified as follows:

> QUESTION: Do you consider that that visit was in any way related to this procurement that's in this appeal, this case?
>
> ANSWER: I could see where that might perhaps be some indirect relationship that someone might draw, but I did not consider that it was.
>
> QUESTION: Was it directly related to the fact that this was a procurement coming up in August of '86, for example?
>
> ANSWER: It was not advertised as such. Again, I could see where someone might draw that relationship, but the purpose for the trip was not advertised as such.

Transcript at 262–63. There is no other evidence to support a charge of improper motive or prejudicial contact in this visit. Given the strong presumption that govern-

---

24. The prejudice or "injury" that CACI must establish is that "the government's breach of its implied contract to deal fairly with all bidders denied CACI the opportunity to have its bid considered solely on its merits." *CACI, Inc.–Federal v. United States*, 719 F.2d 1567, 1575 (Fed.Cir.1983). The inclusion of security as an evaluation factor in the SSP but not in the RFP did not deny CACI this opportunity.

25. Corporate experience was listed as an evaluation factor in ¶ M.3.B(1). The ability to demonstrate an understanding of the scope and requirements of the performance work statement was an implicit evaluation factor in paragraphs M.2 and M.3, reinforced by the specific language of the third sentence of ¶ M.3. Moreover, the examples cited by the CO as demonstrating this lack of understanding of the work—proposed staffing, material handling equipment, and labor mix—were listed as evaluation criteria in paragraphs M.2.A ("Staffing") and M.3.A(3) ("estimating and scheduling of work"; "resources assignment"). The relevant experience of proposed key personnel was listed as an evaluation factor in ¶ M.3.B(2).

The evaluation factors upon which CACI's proposal was rejected are also repeated in Section L of the RFP. Walden testified that he referred to Section L for an interpretation of at least some of the Section M evaluation factors.

ment officials act correctly, honestly, and in good faith, *Sanders v. United States,* 219 Ct.Cl. 285, 302, 594 F.2d 804, 813 (1979); *Kalvar,* 211 Ct.Cl. at 198, 543 F.2d at 1301–02; *Wathen v. United States,* 208 Ct.Cl. 342, 354, 527 F.2d 1191, 1198 (1975), *cert. denied,* 429 U.S. 821, 97 S.Ct. 69, 50 L.Ed.2d 82 (1976), the court finds that the allegation of bias is without merit.

V. *Competitive Range Determination and Meaningful Discussions*

 In a negotiated procurement, FAR section 15.609(a), 48 C.F.R. § 15.609(a), requires the CO to determine which proposals are in the competitive range for the purpose of conducting oral or written discussions.[26] CACI argues that its proposal was determined by the CO to be within the competitive range but that meaningful discussions, within the context of FAR § 15.610, were not conducted. Specifically, CACI alleges that it was not informed by the CO of deficiencies in its proposal in violation of FAR § 15.610(c)(2), which requires the CO to advise each offeror within the competitive range of deficiencies in its proposal so that the offeror is given an opportunity to revise its proposal to satisfy the Government's requirements.

On March 2, 1987, based upon her review of the TRP's numerical rankings and the wide disparity between CACI's ranking and the rankings of the remaining offerors, the CO determined that all offerors except CACI were "out of the competitive range and technically unacceptable for the purpose of conducting oral or written discussions." Although defendant argues that no formal competitive range determination was made regarding CACI's proposal, it concedes that the CO made a *de facto* competitive range determination by conducting discussions with CACI. In *M.W. Kellogg Co. v. United States,* 10 Cl.Ct. 17, 23 (1986), the court stated:

> While the record supports the contention that no express competitive range deter-

mination was made by the government, it is concluded that *de facto* competitive range determinations were made. It is well established that a proposal must generally be considered to be within the competitive range unless it is so technically inferior or out of line as to price, as to render discussions meaningless.... Stated another way, a proposal will generally be considered to be within the competitive range until, as a result of written or oral discussions, it has been determined to no longer have a reasonable chance for being selected for award.

(citations omitted). *See also San/Bar Corp.,* B–219644.3, Feb. 21, 1986, 86–1 CPD ¶ 183, at 8 ("[T]he proposals which are to be considered within the competitive range are those which are technically acceptable or reasonably susceptible of being made acceptable—that is, proposals which have a reasonable chance of being selected for award."); *Technology/Scientific Servs., Inc.,* B–167983, Mar. 11, 1970 (unpublished) ("[A]n offer need not be technically acceptable as submitted to be considered within a competitive range for the purpose of participating in negotiations...."); *Moxon, Inc.,* B–179160, Mar. 13, 1974, 74–1 CPD ¶ 134 ("[W]here an offeror's failure to provide detailed information renders the proposal inferior but not unacceptable the proposal should be considered within the competitive range for discussion.... A proposal must be regarded as being in the competitive range unless it is so deficient or out of line in price as to preclude further meaningful negotiations.").

The court concludes that CACI was initially determined to be within the competitive range. First, the TRP rated CACI's proposal as "satisfactory," defined by the SSP as a proposal that meets the established minimum requirements for each element in the RFP. Second, and more importantly, defendant concedes that a *de facto* competitive range determination was made with respect to CACI's proposal and that

---

**26.** FAR § 15.609(a) also provides:
The competitive range shall be determined on the basis of cost or price and other factors that were stated in the solicitation and shall include all proposals that have a reasonable

chance of being selected for award. When there is doubt as to whether a proposal is in the competitive range, the proposal should be included.

discussions were held with CACI; defendant's claim that meaningful discussions were held presumes a CO determination that CACI's proposal was within the competitive range. Whether CACI remained in the competitive range after the alleged discussions is examined below. *See* FAR § 15.609(b), 48 C.F.R. § 15.609(b) (1986).

FAR section 15.610(b), 48 C.F.R. § 15.610(b), requires the CO to conduct written or oral discussions with all responsible offerors who submit proposals within the competitive range.[27] "The content and extent of the discussions is a matter of the contracting officer's judgment, based on the particular facts of each acquisition...." *Id.; see also Action Mfg. Co. v. United States*, 10 Cl.Ct. 474, 479 (1986) ("[T]he contracting officer has broad discretion when dealing with negotiations between the government and offerors."). In addition, FAR § 15.610(c) provides:

The contracting officer shall—

(1) Control all discussions;

(2) Advise the offeror of deficiencies in its proposal so that the offeror is given an opportunity to satisfy the Government's requirements;

(3) Attempt to resolve any uncertainties concerning the technical proposal and other terms and conditions of the proposal;

(4) Resolve any suspected mistakes by calling them to the offeror's attention as specifically as possible without disclosing information concerning other offerors' proposals or the evaluation process ...; and

(5) Provide the offeror a reasonable opportunity to submit any cost or price, technical, or other revisions to its proposal that may result from the discussions.

Despite this requirement to conduct written or oral discussions with offerors within the competitive range, the CO may not engage in technical leveling or technical transfusion. FAR § 15.610(d), 48 C.F.R. § 15.610(d). Technical leveling is defined as "helping an offeror to bring its proposal up to the level of other proposals through successive rounds of discussion, such as by pointing out weaknesses resulting from the offeror's lack of diligence, competence, or inventiveness in preparing the proposal." FAR § 15.610(d)(1). Technical transfusion is defined as "Government disclosure of technical information pertaining to a proposal that results in improvement of a competing proposal." *Id.* § 15.610(d)(2).

CACI alleges that although the CO determined CACI's proposal to be within the competitive range, meaningful discussions were not held as required by the FAR; i.e., the CO did not point out deficiencies in CACI's proposal and did not give CACI a reasonable opportunity to revise its proposal. Many cases, including Comptroller General decisions,[28] have defined what constitutes "meaningful discussions." In *Furuno U.S.A., Inc.*, B-221814, Apr. 24, 1986, 86-1 CPD ¶ 400, at 5, the Comptroller General stated, "Although agencies are not obligated to conduct all-encompassing discussions, that is, to address in express detail all inferior or inadequate aspects of a proposal, agencies still *must lead offerors into the areas of their proposals which require amplification....* Accordingly, one purpose of discussions is to advise offerors within the competitive range of informational deficiencies in their proposals so that they can be given an opportunity to satisfy the government's requirements." (emphasis added) (citations omitted). *See also Electro–Methods, Inc. v. United States*, 7 Cl.Ct. 755, 768–69 (1985); *Price Waterhouse*, B-222562, Aug. 18, 1986, 86-2 CPD ¶ 190, at 4–5; *E.H. Pechan & Assocs., Inc.*, B-221058, Mar. 20, 1986, 86-1 CPD ¶ 278, at 4–5 ("[I]t is not necessary for an

---

27. Defendant does not dispute that CACI was a responsible offeror.

28. Comptroller General decisions are not binding on the Claims Court. *National Forge Co. v. United States*, 779 F.2d 665, 668 (Fed.Cir.1985); *Quality Transport Servs., Inc. v. United States*, 12 Cl.Ct. 276, 282 (1987). Such decisions, however, when reasonable and persuasive, have been used by the court for general guidance. *See, e.g., Denkler v. United States*, 9 Cl.Ct. 654, 659 (1986); *Hayes Int'l Corp. v. United States*, 7 Cl.Ct. 681 (1985); *Kinetic Structures Corp. v. United States*, 6 Cl.Ct. 387, 396 (1984). Both parties rely on Comptroller General decisions in their pretrial and post-trial submissions.

agency to furnish information in any particular form or manner, provided that it finds some means which reasonably communicates the nature and gravity of its concerns."); *Technical Servs. Corp.*, B–216408.2, June 5, 1985, 85–1 CPD ¶ 640, at 5; *E–Systems, Inc.*, B–191346, Mar. 20, 1979, 79–1 CPD ¶ 192, at 9 ("There is no fixed, inflexible rule regarding the requirement for discussions.... [R]equests for clarification or amplification or other statements made during oral discussions which lead offerors into areas of their proposals that are unclear are sufficient to alert offerors to deficiencies in their proposals."); FAR § 15.601, 48 C.F.R. § 15.601 (1986).

▮▮ Defendant argues, based on (1) the CO's two written requests for further clarification and detail on CACI's proposal; (2) the March 19th meeting between the CO and CACI representatives; (3) two telephone requests by the CO for additional information; (4) the April 29th meeting between CACI representatives and GSA personnel; and (5) the fact that CACI was permitted to, and did, submit revisions to its proposal following each request for more information, that the Government conducted meaningful discussions with CACI. While the court agrees with CACI that more could have been done to communicate the Government's concerns, the level of discussions was, given the legal threshold, adequate. On March 19, 1987, the CO sent a letter to CACI outlining eight areas in its technical proposal that required "further clarification and detail." CACI was specifically asked to provide information on the qualifications of personnel, on corporate experience, and on staffing level.[29] CACI provided this information to the CO in a letter dated March 26, 1987, and enclosed a significant number of revised proposal pages.[30] On April 2, 1987, the CO telephoned CACI and asked for additional information regarding corporate experience[31] and staffing. CACI provided this information, as requested by the CO, on that same day. On April 7, 1987, the CO again sent a letter to CACI; the letter stated, "Based on our review of your revised technical proposal dated March 26, 1987 it has been determined that the following areas require additional information." CACI was asked to provide information on staffing, MHE, subcontractors, forklift operators, and key personnel.[32]

**29.** The March 19th letter stated, "The following areas lack sufficient detail and require your clarifications." Under the category of "Personnel," CACI was asked for information regarding qualifications, resumes, commitments from key personnel, and the operational impact of cross utilization of resources. Under the category of "Corporate Experience," CACI was asked for information regarding production control, receiving, export, and shipping. Under the category of "Staffing Level (All areas)," CACI was asked to "[c]learly demonstrate how these numbers/employees will perform the duties/functions as required in the Statement of Work." These three categories were listed in the May 7, 1987 rejection letter as areas in CACI's proposal that were determined to be unacceptable.

**30.** These revised pages were colored blue and marked as "Revision 1, March 27, 1987" in CACI's proposal.

**31.** Specifically, the CO requested information on CACI's currently ongoing warehouse-type contracts that could serve as examples of CACI's corporate experience.

**32.** Four of these areas—staffing, MHE, forklift operators, and key personnel—were grounds for finally rejecting CACI's proposal. Under "Staffing," CACI was asked to provide (a) "detailed plan of staffing during the first 90 days of the contract period (Not Phase–In Period) that guarantees CACI will provide the level of quality necessary to support the operation," and (b) "details/job descriptions of your intended use of 'Supply Clerks.' This must include the amount of time you expect to use them for each job function or duty they are to perform." Under "Material Handling Equipment," CACI was asked to provide "the numbers and kinds that will be on-hand to perform this contract. This must include a detailed breakout of the lease cost ($276,298.00) shown in Volume III of your proposal." Under "Forklift Operators," CACI was asked to provide "detailed information concerning the availability and level of staffing of forklift operators, which shows how the numbers provided for in your proposal will supports [sic] the operation." Under "Key Personnel," CACI was asked to provide "letters or other forms of communication with key personnel that further indicates the availability and interest of these individuals to perform at the Stockton Facility." The court repeats the language of the CO's request here to demonstrate that CACI was specifically informed of the need for additional detail in the areas of its technical proposal that were later determined by the CO to be unacceptable.

Moreover, CACI apparently spoke with the CO on the telephone after receiving the April 7th letter to clarify some of the CO's information requests. CACI provided this information in a ten-page letter (with enclosures) and a one-page letter both dated April 14, 1987. Finally, on April 29, 1987, at the request of the CO, CACI presented an oral briefing on its technical proposal and management plan. CACI presented information, and was asked questions by GSA personnel, on corporate experience, proposed use of MHE, staffing, labor mix, key personnel, and CACI's understanding of the Stockton operations—all areas that were finally determined by the CO to be unacceptable aspects of CACI's proposal.[33] CACI submitted revisions to its technical proposal, as requested by the CO at the April 29th briefing, on May 1 and 4, 1987.[34] In addition, the CO indicated at the conclusion of the briefing that CACI could submit formal revisions to its proposal on any other areas if it were to "go back and ... think of something." *See* Defendant's Exhibit # 9A at 80–81; Transcript at 211–12, 667–68.

The court notes that the discussions with CACI could have been more explicit. The principal purpose of an A–76 procurement is to determine whether performance by the private sector would be more economical than performance by the Government. It is thus in the Government's interest, as it is in all negotiated procurements, to be as explicit in discussions as possible in order to obtain the most advantageous offer. Defendant counters that if the CO had been more detailed in her discussions with CACI, such discussions might have consti-

tuted technical leveling or technical transfusion. *See* FAR § 15.610(d)(1), (2), 48 C.F.R. § 15.610(d)(1), (2) (1986).

As stated in *M.W. Kellogg Co. v. United States*, 10 Cl.Ct. 17, 25 (1986):

Technical leveling is the disclosure of "one proposer's innovative or ingenuous solution to a problem * * *." *Drexel Heritage Furnishings v. United States*, 7 Cl.Ct. 134 (1984), *citing* B–173677, 51 Comp.Gen. 621, 622 (1972). Thus, "providing an offeror with information as to specific desired items or approaches to the detriment of another offeror who may have initially proposed such an item or an innovation or desired approach" is prohibited conduct. *Rockwell Intern. Corp. v. United States*, 4 Cl.Ct. 1 (1983).

*See also Aviation Contractor Employees, Inc.*, B–225964, Mar. 30, 1987, 87–1 CPD ¶ 363, at 4; *Price Waterhouse*, B–222562, Aug. 18, 1986, 86–2 CPD ¶ 190, at 5–6. "Technical transfusion" occurs through government disclosure of technical information contained in one proposal that results in the improvement of a competing proposal. *See Space Communications Co.*, B–223326.2, Oct. 2, 1986, 86–1 CPD ¶ 377, at 11–12.

Given the fact that the Government theoretically remained as a bidder in this A–76 solicitation, the CO's concern was not illusory. Nevertheless, the Government could have conducted more explicit discussions with CACI without engaging in technical leveling or technical transfusion (e.g., "The lack of relevant experience by the proposed key personnel is a deficiency."). Such dis-

**33.** CACI alleges that it was somehow prejudiced by the fact that the CO, when requesting CACI to give the April 29th briefing, denied that any member of the TRP would be present at the briefing. In fact, at least the chairman of the TRP was present. CACI argues, in effect, that if it thought any member of the TRP would be present at the briefing, it would have prepared a more detailed presentation and would have been better equipped to answer technical questions. The evidence does not bear out CACI's argument, however. Based upon the transcript of the briefing, CACI seemed prepared to answer all questions and present detailed information on its proposal. Moreover, Walden's memorandum for record prepared after the April

23rd telephone call from the CO (requesting the April 29th briefing) conclusively demonstrates that CACI was planning to give a "full blown technical pitch" and answer questions. *See supra* note 11. The fact that a TRP member was present at the briefing was not prejudicial to CACI given that the briefing was audiotaped; the transcript could have been given to a TRP member for review. CACI should have been prepared to address any of the CO's technical concerns, and apparently CACI was so prepared.

**34.** These revisions appear as green pages in CACI's technical proposal. They are labelled "Revision 2, May 1, 1987."

closures, as long as they were not brought out "through *successive* rounds of discussions," FAR § 15.610(d)(1), 48 C.F.R. § 15.610(d)(1) (emphasis added), and did not reveal technical information contained in the Government's MEO, would not have been improper. Despite the fact that more specific and forthright conversation could have been held, the limited question for the court is whether the discussions that did take place were minimally adequate. Given the CO's "broad discretion when dealing with negotiations between the government and offerors," *Action Mfg. Co. v. United States*, 10 Cl.Ct. 474, 479 (1986), the court concludes that they were.

All of the written and oral correspondence delineated above demonstrates to the court that the Government's requests for additional clarification and detail should have led CACI into the areas of its proposal that required amplification. *See Furuno U.S.A., Inc.*, B–221814, Apr. 24, 1986, 86–1 CPD ¶ 400, at 5. CACI was on notice of the areas in its proposal ultimately determined by the CO to be unacceptable and was given the opportunity to revise these deficient areas.[35]

■■■ CACI alleges, however, that it would have provided more detailed revisions if the Government had used the word "deficiency" or "weakness" when describing the areas of CACI's proposal requiring additional information.[36] CACI has not presented evidence as to what additional details could have been provided. Even assuming that such details did exist, CACI has not given an adequate explanation for withholding such information. It is apparent to the court that CACI provided as complete a response to the Government's requests for information as was possible.

FAR section 15.601, 48 C.F.R. § 15.601, defines a "clarification" as a communication designed to eliminate "minor irregularities, informalities, or apparent clerical mistakes in the proposal." CACI thus argues that the CO's use of the term "clarification" rather than "deficiency" contributed to the lack of meaningful discussions. The court does not dispute that CACI sincerely believed the Government was not pointing out "deficiencies" or "weaknesses" in its technical proposal. This belief, however, was unreasonable given the evidence described above.[37] *See Technical Servs. Corp.*, B–214634, Feb. 7, 1985, 85–1 CPD ¶ 152, at 8. CACI should have realized the clear import of the CO's information requests and questions—that there were several informational, if not technical, defects in CACI's proposal. Moreover, neither FAR subpart 15.6 nor the case law defining "meaningful discussions" requires use of the word "deficiency" or "weakness." The Government's requests for clarification or amplification of specific areas in CACI's proposal—in association with giving CACI the opportunity to revise these areas—

---

**35.** CACI argues that it was not given an opportunity to revise its proposal in response to the deficiencies noted by the TRP as a result of the April 29th briefing. It was the April 29th meeting itself, however, that was CACI's opportunity to revise informational and technical deficiencies in its proposal. The TRP comments prepared after the briefing served, in part, as the basis for the CO's decision to declare CACI's proposal unacceptable. As stated in FAR § 15.610(b), "the *extent* of the discussions is a matter of the contracting officer's judgment." Thus, at some point after meaningful discussions take place, the CO may properly determine that a particular offeror's proposal is technically unacceptable and that revisions are no longer necessary. *See Space Communications Co.*, B–223326.2, Oct. 2, 1986, 86–2 CPD ¶ 377, at 9; FAR § 15.609(b), 48 C.F.R. § 15.609(b) (1986); *see also Technical Servs. Corp.*, B–216408.2, June 5, 1985, 85–1 CPD ¶ 640, at 5 ("[A]n agency is not required to help an offeror along through a series of negotiations so as to improve its technical rating until it equals that of other offerors.").

**36.** CACI also argues that it was given insufficient time in which to make proposal revisions. Some of the response times were indeed extremely short. Nevertheless, CACI never asked the CO for additional time. Nor does it allege that more time would have resulted in different responses to the CO's information requests. Absent this showing, the court cannot conclude that the time granted to CACI by the CO was unreasonable.

**37.** There is no evidence as to whether CACI ever specifically asked the CO if the additional clarifications and details that the Government needed were in response to deficiencies or weaknesses in CACI's proposal. CACI could have asked the CO this question if it had any doubts.

were sufficient to alert CACI to deficiencies and weaknesses and, accordingly, met the requirements of FAR § 15.610(c). *See Prudential–Maryland Joint Venture Co.,* 590 F.Supp. at 1408; *Rockwell Int'l Corp. —Claims for Costs,* B–222534.2, Nov. 18, 1986, 86–2 CPD ¶ 574, at 9–10; *GTE Gov't Sys. Corp.,* B–222587, Sep. 9, 1986, 86–2 CPD ¶ 276, at 8–10. Accordingly, the court concludes that the Government did conduct meaningful discussions with CACI.

## VI. *Failure to Request a Best and Final Offer*

■ FAR section 15.611(a), 48 C.F.R. § 15.611(a), requires the CO, upon the completion of discussions, to "issue to all offerors still within the competitive range a request for best and final offers." [38] However, FAR section 15.609(b), 48 C.F.R. § 15.609(b), provides that if the CO, after complying with section 15.610(b)'s requirement to conduct discussions, "determines that a proposal no longer has a reasonable chance of being selected for contract award, it may no longer be considered for selection." Thus, if after the April 29th briefing the CO determined that CACI's proposal was no longer in the competitive range, it would not have been appropriate to ask CACI for a best and final offer. As discussed *infra,* the CO's determination at the end of discussions that CACI's proposal no longer had a reasonable chance of being selected for award had a rational basis. Therefore, she properly declined to ask CACI for a best and final offer. *See Operations Research, Inc.,* B–178001, May 14, 1974, 53 Comp.Gen. 860, 861 ("[I]n those situations where discussions relating to an ambiguity or omission make clear that a proposal should not have been in the competitive range initially, we believe it would be proper to drop the proposal from the competitive range without allowing the submission of a revised proposal.").

**38.** In addition, ¶ M.2 of the RFP states that offers considered "satisfactory or above will be subject to an evaluation of price proposals." CACI argues that because the TRP rated its technical proposal as being "satisfactory," the price proposal should have been evaluated. As stated previously, however, the CO is not bound by the recommendations of the panel. *See Pru-*

Having concluded that CACI has not proven a clear and prejudicial violation of any procurement regulations or statutes, the court now considers CACI's allegation that the CO's decision to reject its proposal lacked a rational basis.

## VII. *Rationality of the CO's Decision*

As stated in section I, *supra,* the court grants wide discretion to the CO in the evaluation of proposals. Regardless of the fact that this court's independent evaluation might have found CACI's proposal acceptable, the standard of review of a CO determination that a technical proposal is unacceptable is limited. *See Electro–Methods, Inc. v. United States,* 7 Cl.Ct. 755, 762 (1985) (Where an agency's decisions are highly technical in nature, "judicial restraint is appropriate."); *Prudential–Maryland Joint Venture Co.,* 590 F.Supp. at 1401, 1406–07; *Memorex Corp.,* B–212660, Feb. 7, 1984, 84–1 CPD ¶ 153, at 3. Keeping in mind the considerable discretion given to the CO, the court now examines each area of CACI's proposal ultimately determined by the CO to be unacceptable.

### A. *Corporate Experience*

■ In the rejection letter sent to CACI on May 7, 1987, the CO stated that CACI had no "previous corporate experience of the scope and complexity of the Stockton Wholesale Distribution Center." Paragraph M.3.B(1) of the RFP provides that one evaluation subfactor is the "[r]eputation and experience of the corporation in managing similar facilities of size, and complexity." CACI argues that the CO's determination that CACI did not have the requisite corporate experience lacked a rational basis. Specifically, CACI claims that it did have experience in operating a similar facility for the Royal Saudi Naval Forces

*dential–Maryland Joint Venture Co.,* 590 F.Supp. at 1407; *Bendix Field Eng'g Corp.,* 85–2 CPD ¶ 496, at 4; *RCA Serv. Co.,* B–208871, Aug. 22, 1983, 83–2 CPD ¶ 221, at 5. Although CACI's proposal was initially "satisfactory" to the TRP, the CO considered it only reasonably susceptible of being made satisfactory (which is why the CO conducted discussions).

("the Saudi contract").[39] In addition, CACI alleges that the CO applied an unrealistically high standard to the language in the RFP by requiring experience in facilities that were the *same as* the Stockton WDC. *See, e.g., SEI Information Technology*, B–219668, Dec. 12, 1985, 85–2 CPD ¶ 649, at 4 (holding that the agency applied "a requirement for experience with prior projects virtually identical in scope and size to that contemplated under the RFP," which was a more stringent requirement than offerors could reasonably have anticipated).

CACI's Saudi contract involved supply support services for the Royal Saudi Naval Forces. The contract required the establishment of an Asset Control Point ("ACP") multi-warehouse complex with approximately 700,000 square feet of space. One of the disputes concerning the similarity of the Saudi contract with the Stockton WDC regards the actual amount of space that the ACP warehouse complex utilized. CACI's proposal stated that the ACP complex covered approximately 700,000 square feet. At the April 29th briefing, one CACI representative indicated that the warehouse complex covered 1.5 million square feet and another CACI representative indicated that it only covered 500,000 square feet. Defendant's Exhibit # 9A at 30, 34–35. At trial, Richard Nygaard, the Department Group Manager of CACI, Inc.–Federal's Logistics Program Office, and CACI's proposed Center Manager for the Stockton WDC, indicated that 1.5 million square feet was a clear overstatement. Nygaard testified that the ACP warehouse, at its peak, comprised approximately 700,000 square feet. Transcript at 479. The Stockton WDC, on the other hand, covered over 2 million square feet. *Id.* Consequently, it would seem that the ACP warehouse was not a facility of similar size to the Stockton

WDC. Nygaard also testified, however, that because the Stockton facility made poor use of its space, it equated to a "well-utilized" 1,000,000 gross square foot warehouse complex. *Id.* at 480. Notwithstanding this allegation, it was not apparent from CACI's proposal that it provided for better utilization of the space at Stockton. *Id.* at 484. In the absence of any evidence supporting Nygaard's assessment of the Stockton facility, the court cannot conclude that the Saudi contract was similar in size to Stockton. In this regard, therefore, the CO's decision did not lack a rational basis.

The court also concludes that the CO's decision that the Saudi contract was not similar in complexity to Stockton had a rational basis. The Saudi ACP facility was a staging operation for export. "CACI established requisition due dates, tracked requisition status, expedited, delayed, or erroneously cancelled material, processed receipts and issues, kitted outfitting material for the Saudi Base complex on a building by building basis, assembled and staged pre-kitted Saudi Supply Center supply support cabinets and processed all material for export shipment." Defendant's Exhibit # 1B at 45 (CACI's description of the Saudi contract). The TRP described the Saudi contract as a "kitting" operation, in which material is received, put into storage until needed, assembled into kits at a predetermined time, and shipped to one of two different locations in Saudi Arabia. *Id.* at 37, 46; Transcript at 282. CACI was generally given at least one month of advance notice before having to ship a container of items to Saudi Arabia.[40] CACI handled approximately 850 supply transactions [41] daily, and utilized between 200 and 300 personnel, in addition to an intermittent part-time staff. The ACP warehouse stored approximately 56,000 line items.

---

39. Although CACI's proposal contained references to a total of nine contracts as examples of CACI's corporate experience, CACI relies upon its Saudi contract as fulfilling the corporate experience requirement. *See* Defendant's Exhibit # 9A at 34.

40. CACI had some experience with expedited shipping operations under its Operation Straight Arrow, implemented under the Saudi contract.

Under this program, CACI could expedite the shipment of an item or quickly identify the location of an item already shipped. Defendant's Exhibit # 9A at 32.

41. A supply transaction involved either the receipt of an item, the selection of an item for shipment, or the actual shipment of an item. Defendant's Exhibit # 9A at 40–41.

Successful operation of the Saudi ACP facility clearly demonstrated a significant competence in performing tasks identical or similar to those at the ACP.

In contrast to the ACP warehouse operation, the Stockton WDC—one of four full service wholesale distribution centers operated by GSA [42]—is responsible for shipping items to over 50,000 civilian and military customers throughout the world. According to estimates contained in the RFP, the Stockton WDC would have, on average, 3654 daily supply transactions during the first six months of contract performance.[43] In addition, unlike the ACP operation, the Stockton WDC receives little advance notice before items are to be shipped.[44] The Stockton WDC is also the only GSA storage location that supports the Fire Suppression Support Program, a program that supplies fire suppression items to federal and state agencies in emergency situations.[45] Furthermore, it is clear that the Stockton CSC is much more like a retail operation than the Saudi ACP.

While it may well have developed that CACI could have successfully taken over the Stockton WDC, the court is unwilling, given the limited scope of review of CO decisions on technical matters, to conclude that the differences pointed to by the CO are illusory or contrived. The court finds that the CO had a rational basis to conclude

that CACI lacked previous corporate experience in managing similar facilities of the size and complexity of Stockton. Consequently, CACI's allegation that the CO applied an unrealistically high standard to the language in the RFP by requiring experience in facilities that were the same as the Stockton WDC is rejected.[46]

Because the lack of corporate experience was a sufficient independent ground for rejecting CACI's proposal, see RFP ¶ M.3, the court need not decide whether the other grounds for the CO's decision lacked a rational basis. Even if the other grounds did lack a rational basis, CACI would not be entitled to relief. Nevertheless, because each of the evaluation subfactors could be properly characterized as sufficient independent grounds for rejection, the court will examine the other areas of CACI's proposal declared unacceptable by the CO in the May 7th letter.

**B.** *Proposed Staffing*

 In the May 7, 1987 rejection letter, the CO concluded that CACI failed to demonstrate an understanding of the scope and requirements of the PWS. CACI's proposed staffing was cited as one example that supported this conclusion. Offerors were advised by paragraph M.2.A of the RFP that one component of the "Techni-

---

**42.** A "full service" WDC performs both domestic and export operations. *See supra* note 2.

**43.** Section J, exhibit 3, in the RFP contains workload estimates for the Stockton WDC. According to this exhibit, there would be 109,622 shipping and receiving transactions each month for the first six months of the contract. These figures do not include the estimated shipping and receiving transactions for the Stockton CSC. The monthly transactions for both the WDC and the CSC were projected to increase over the three-year term of the contract (this includes the two option years).

**44.** The RFP stated that the Stockton WDC stocked approximately 9700 items.

**45.** According to the RFP's performance work statement, "the WDC Stockton could expect in excess of 2,500 emergency order lines for fire suppression support in a 30–day period [during the fire season]. During the fire emergency, the Contractor may be required to work 24 hours a

day to support the fire suppression program." CACI did not present any evidence of experience in a similar type of emergency support service.

**46.** *SEI Information Technology,* B–219668, Dec. 12, 1985, 85–2 CPD ¶ 649, cited by CACI, is inapposite. In *SEI,* the Comptroller General held that the agency applied a requirement for corporate experience in projects virtually identical in scope to that contemplated under the RFP. This was a more stringent requirement than offerors could reasonably have anticipated. In the present case, CACI could reasonably have anticipated that it needed to demonstrate corporate experience in a facility that was at least similar in size and complexity as Stockton. Because the CO's decision that CACI's Saudi contract was not similar in size and complexity had a rational basis, the court cannot conclude that the CO required a more stringent showing. The CO's testimony at trial and the comments of the TRP support the conclusion that the corporate experience evaluation subfactor was properly applied.

cal" evaluation factor would be an offeror's staffing. In addition, paragraph M.3.A(3) provides that offerors would be evaluated on the basis of their operational plans, including "estimating and scheduling of work" and "resources assignment." CACI argues that the CO had no factual basis on which to conclude that CACI's proposed staffing was inadequate. Specifically, CACI contends that the CO improperly considered *daily* workload staffing even though the data necessary to compute daily staffing requirements was not provided by the RFP.[47] Furthermore, CACI points out that its proposal planned for surge staffing of up to 100% of full-time personnel to meet exigencies.

The CO gave several reasons for concluding that CACI's proposed staffing indicated a lack of understanding of the complexity of the Stockton WDC. First, although CACI computed its full- and part-time staffing requirements using time and motion studies, it could not adequately explain how the employees, once assigned, could perform the work. Second, when CACI revised (on March 27, 1987) its allocation of part-time and full-time employees between several organizational groups, it did not explain (1) why such changes were made, and (2) how the original time and motion studies supported such changes. Third,

CACI was unable to explain at the April 29th briefing how the time and motion studies were accomplished. Fourth, the CO believed, based on computations of the TRP, that CACI's productivity rate (line items handled per paid man hour) might not be sufficiently high until after several months of contract experience. Fifth, CACI could not provide an estimate for the minimum daily workload expected at Stockton.[48] Sixth, CACI could not explain its determination of the number of full-time versus part-time personnel. Finally, CACI underestimated the number of personnel needed to staff the export operations at Stockton.[49]

Although the court is not persuaded that any one of the above reasons would be a sufficient ground by itself to reject CACI's proposal, the court concludes that, when considered collectively, these reasons provide a rational basis for the CO's determination that CACI's proposed staffing demonstrated a lack of understanding of the complexity of the Stockton operation.

### C. Material Handling Equipment

▮ In the May 7, 1987 rejection letter, proposed MHE was cited as a second example that demonstrated CACI's lack of understanding of the scope and requirements of the PWS.[50] Paragraph 4.2.1 in

---

47. CACI also argues that this issue was not mentioned until the April 29th briefing. Insofar as CACI is arguing that it was not given a chance to revise its proposal in response to the CO's inquiries on April 29th, the court concludes, for reasons expressed previously, that such an argument is without merit. If CACI is arguing that April 29th was too late a time to bring up proposed staffing, that argument is equally without merit.

48. CACI argues that the data necessary to compute daily workload requirements were not provided by the RFP. The court notes, however, that exhibit 3 in Section J of the RFP provides monthly workload estimates. CACI could have divided these estimates by 30 to achieve an average daily workload. Moreover, CACI stated in its proposal that "the number of full time employees is based on accomplishing the minimum anticipated daily workload." Consequently, CACI must have had some daily workload estimate in mind in formulating its staffing proposal.

49. CACI proposed 8662.9 staffing hours per month for Stockton's export operations. Based

on the RFP's estimated number of export lines per month (22,457) and the TRP's estimation for CACI's productivity rate (3.1 line items handled per man hour), CACI's proposed staffing hours for export seems more than sufficient. The court notes, however, that the TRP believed CACI's productivity rate might not be as high as estimated until after several months of contract experience.

50. The court does not rely on the CO's analysis concerning labor mix, the third example cited in the May 7th rejection letter to show a lack of understanding of the scope and requirements of the PWS. The dispute centers around the use of supply clerks vis-a-vis warehousemen and forklift operators. The CO and the TRP expressed concern over the use of supply clerks in warehouseman functions and in operating forklifts. CACI did not, however, ever express an intention to use supply clerks to operate forklifts. In addition, pursuant to Department of Labor guidelines for supply clerk functions, *see* Wage and Hour Div., Employment Standards Admin., U.S. Dep't of Labor, *Service Contract Act—Direc-*

Section C of the RFP states that the contractor "shall provide all material handling equipment, such as forklifts, batteries, and battery chargers necessary to perform the requirements of the contract." RFP paragraph M.3.A(3) provides that offerors would be evaluated on the basis of their operational plans, including "resources assignment."

At trial, the CO testified that CACI never described how it intended to utilize the proposed MHE in accomplishing the contract requirements. CACI responded to this issue at the April 29th briefing, although not to the satisfaction of the CO. The primary dispute regarding MHE, however, centers around CACI's proposed use of forklifts. In fiscal year 1985, the Stockton facility used seventy-nine internal combustion forklifts and seventy-six electric forklifts. Based on the estimated hours of utilization per year for these forklifts, the Stockton facility required a total of 143,616 hours per year for forklifts.[51] CACI proposed fifty-one new forklifts to replace the ones that were in use at Stockton. These forklifts would provide 78,540 hours of utilization.[52] The Government would be furnishing only nine additional forklifts. In addition, CACI did not propose any innovations in the operation of the Stockton WDC that would significantly reduce the need for forklifts; the other MHE proposed by

CACI could not perform in place of forklifts.

Based on the above description of CACI's proposed use of MHE, the court cannot conclude that the CO lacked a rational basis in deciding that CACI's use of MHE failed to demonstrate an understanding of the complexity of the Stockton operation.

### D. *Key Personnel*

In the rejection letter sent to CACI on May 7, 1987, the CO stated that CACI's proposal demonstrated a lack "of relevant experience by the proposed key personnel." Paragraph M.3.B(2) of the RFP provides that one evaluation subfactor is "the qualifications proposed or detailed for Key Positions." The specific qualifications for the Center Manager, the Buildings Operation and Maintenance Supervisor, and the Export Operations Specialist are provided in Section C of the RFP, paragraphs 1.2.5.1, 1.2.5.3, and 1.2.5.4., respectively. In addition, paragraph 1.2.2.1 of RFP Section C states that the contractor must designate an Alternate Center Manager to act in the Center Manager's absence; this individual must be "fully qualified to act for the Center Manager in all matters." The CO contends that the key personnel proposed by CACI for these four positions do not meet the minimum mandatory qualifications in terms of experience.

---

*tory of Occupations* ¶ 10370 (Jan.1985), supply clerks may perform certain tasks that were also performed by warehousemen at the Stockton WDC.

The primary reason for the CO's and TRP's concern was the inadequate description by CACI of exactly how the supply clerks would be used. In a revision to its proposal, CACI listed twenty-six areas in which a supply clerk at Stockton could perform, drawn directly from the Department of Labor guidelines. CACI's submissions concerning its use of supply clerks led to a logical inference of how they would be utilized at Stockton.

**51.** This was computed by multiplying the 79 internal combustion forklifts by a utilization rate of 1056 hours per year (83,424) and the 76 electric forklifts by a rate of 792 hours per year (60,192). Plaintiff's Exhibit # 33 at 2. CACI argues that the Government only anticipated needing 100 forklifts in the future. This argument is based on a question prepared by the Government in an informal solicitation survey

given to forklift merchants; the Government was inquiring as to possible future leasing costs for forklifts at the Stockton facility. The question—"Would our costs per unit increase substantially if the quantity decreased from 155 total forklifts [79 internal combustion and 76 electric] to approximately 100?"—is purely hypothetical and does not establish a decreased need for forklifts at Stockton. Moreover, the question does not preclude utilizing 55 of the forklifts that were then in use at Stockton and leasing 100 more.

**52.** The utilization rate for the forklifts proposed by CACI was higher than the rate for the equipment already used at Stockton. Because forklifts had to be available simultaneously at many different locations of the WDC, however, the higher utilization rate would not reduce the need for a certain minimum number of forklifts.

The proposed Center Manager had three years experience "in the storage of shelf-life material which includes hazardous properties" rather than six years as required by the RFP. However, the RFP also stated that the CO could waive this experience requirement if the individual's "accomplishments, experience, and abilities" qualify that person for the Center Manager position. The proposed Buildings Operation and Maintenance Supervisor had the requisite experience and qualifications, although the CO contends that CACI provided no information upon which to verify the individual's resume; the dates of employment were not provided on the resume. The proposed Export Operations Specialist allegedly lacked the requisite experience in export operations outside of the area of packing and crating, particularly in supervisory and training experience. Moreover, the CO contends that this individual did not demonstrate, as required by the RFP, "[o]n-site working level experience" in "documentation interpretation and application," "air and surface movement criteria," and "commodity compatibility." The proposed Alternate Center Manager, who would act primarily as the Production Control Supervisor, clearly did not have the requisite experience. This individual had no experience in managing "an operation of the scope and complexity of this WDC" or in managing and supervising "physical distribution activities." His ability to act in the absence of the Center Manager is therefore a valid concern of the CO.

CACI's only argument regarding the relevant experience of key personnel is that the CO never raised any question regarding the qualifications of key personnel and was only concerned with obtaining letters of commitment. This argument is clearly incorrect. The March 19, 1987 letter sent by the CO to CACI stated that the qualifications and resumes of personnel lacked sufficient detail and required clarification. CACI provided additional details in its March 26, 1987 response and in several revisions to its proposal dated March 27, 1987. The Center Manager's experience was also discussed at the April 29th briefing.

The lack of experience of the proposed Center Manager, the Buildings Operation and Maintenance Supervisor, and the Export Operations Specialist would not, in the absence of other considerations, provide a rational basis to reject CACI's proposal. However, given the clear absence of requisite experience by the Alternate Center Manager, the court concludes that the CO had a rational basis for determining that CACI's proposed key personnel lacked the relevant experience. In this regard, the court also notes that it may not substitute its judgment in such matters for the judgment of the CO. See Baird Corp. v. United States, 1 Cl.Ct. 662, 664 (1983). Thus, the court's belief as to the qualifications of any particular individual cannot override the belief of the CO, as long as there is a rational basis for that belief.

### CONCLUSION

For the reasons expressed above, the court concludes that the CO's determination that CACI's bid was technically unacceptable was not irrational or unreasonable. CACI failed to demonstrate through clear and convincing evidence that there was no rational basis for the CO's determination. In addition, CACI failed to show that the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations. CACI received "the impartial consideration to which it was entitled under the implied contract obligations of the government." Arrowhead Metals, Ltd. v. United States, 8 Cl.Ct. 703, 714 (1985) (citations omitted). Accordingly, the Clerk is directed to dismiss CACI's complaint. Each party is to bear its own costs.

It is so ORDERED.